Exhibit A

**NASDR 003013**

## NASD REGULATION, INC.
## OFFICE OF HEARING OFFICERS

|  |  |  |
|---|---|---|
| DEPARTMENT OF ENFORCEMENT, | : | Disciplinary Proceeding |
|  | : | No. C11970032 |
| Complainant, | : |  |
|  | : |  |
| v. | : |  |
|  | : | Hearing Officer - SW |
| DANIEL RICHARD HOWARD | : |  |
| (CRD #1112346), | : | **Hearing Panel Decision** |
| 4 Canal Park, #205 | : |  |
| Cambridge, Massachusetts 02141 | : | December 1, 1999 |
|  | : |  |
| Respondent. | : |  |

### Digest

The Department of Enforcement filed a two-count Complaint against Respondent Daniel Richard Howard ("Respondent") on January 7, 1999. The Complaint alleged that Respondent (i) violated NASD Conduct Rules 2110 and 2310 by recommending purchases and sales of speculative securities to customer JM, without having reasonable grounds for believing that the transactions were suitable for the customer, and (ii) violated NASD Conduct Rule 2110 by filing inaccurate Form U-4s.

The Hearing Panel found that Respondent violated Conduct Rules 2110 and 2310 by making unsuitable recommendations to customer JM, and violated Conduct Rule 2110 by being responsible for the inaccurate Form U-4s filed with the Association.

The Hearing Panel fined Respondent $17,500 and suspended him for 90 days for the unsuitable recommendations, and fined him $7,500 and suspended him for 90 days for the filing of inaccurate Form U-4s, for a total fine of $25,00 and a total suspension of 180 days. The Hearing Panel also directed Respondent to pay $3,484.25 in hearing costs.

NASDR 003014

Appearances

John M. D'Amico, Esq., Senior Regional Attorney, Boston, Massachusetts, for the

Department of Enforcement.

Daniel Richard Howard, pro se.

## DECISION

## I. Procedural Background

### A. The Complaint

The NASD Regulation, Inc. ("NASDR") Department of Enforcement ("Enforcement")

filed the Complaint in this proceeding against Respondent Howard ("Respondent") on January 7,

1999. Enforcement served the Complaint on Respondent on January 4, 1999 at his address of

record in the NASD's Central Registration Depository ("CRD address"). When Respondent

failed to answer the Complaint, Enforcement served a Second Notice of Complaint on

Respondent at his CRD address on February 2, 1999. Respondent filed an answer to the

Complaint on February 19, 1999.

### B. The Hearing

The Parties presented evidence in two days of hearings, on May 26, and 27, 1999, to a

Hearing Panel in Boston, Massachusetts.[1] Enforcement presented 50 exhibits and five witnesses:

the NASD special investigator; customer JM's widow;[2] and three Moors & Cabot, Inc. ("Moors

& Cabot") employees (the compliance director, the registration clerk, and the Boston office

branch manager). Respondent presented 78 exhibits and, in addition to testifying himself,

presented two witnesses: a former branch manager of H.J. Meyers & Co. ("H.J. Meyers"), who

---

[1]  References to the testimony set forth in the transcript of the Hearing on May 26, and 27, 1999 will be designated as "Tr." References to exhibits presented by Respondent will be designated as "RX-," and references to the exhibits presented by Enforcement will be designated as "CX-."

[2] JM died in November 1998, after the period of the alleged unsuitable recommendations. (Tr. 52).

NASDR 003015

was hired subsequent to the relevant period, and an attorney who had spoken with JM's stepson.

## II. Findings of Fact and Conclusions of Law

### A. Jurisdiction

Respondent became registered with the NASD as a general securities representative on April 16, 1983. (CX-28, 3, 6). Respondent worked as a registered representative at First Albany Corporation ("First Albany") from June 1990 to August 1995, H.J. Meyers from August 1995 to July 1997, The Boston Group from July 1997 to July 1998, the National Securities Corporation from July 1998 to October 1998,[3] and Moors & Cabot from October 1998 to January 1999.[4] (CX-28, 10). Respondent is not currently employed in the securities industry.

Respondent was registered as a general securities representative with Moors & Cabot at the time that Enforcement filed and served the Complaint on January 7, 1999. (CX-28, 39). The Hearing Panel concluded that the Association retained its jurisdiction over Respondent.

### B. NASDR Investigation

The NASDR investigation that culminated in the filing of this Complaint arose because of a complaint letter that JM and his stepson, who signed the letter as JM's attorney-in-fact[5] sent to NASDR District 11 on September 27, 1996. (CX-22; Tr. 78). JM's complaint letter, among other things, alleged that Respondent engaged in unauthorized transactions in JM's account and made unsuitable recommendations. (CX-22). H.J. Meyers and JM agreed, in December 1996, that JM would release H.J. Meyers and all of its employees from any claims, whatsoever, in law or equity, in return for $45,000 from H.J. Meyers. (Tr. 354; CX-30, 3).

_____

[3] The Boston Group L.P. became affiliated with National Securities Corporation on or about August 28, 1998. (RX-47).

[4] Moors & Cabot terminated Respondent on January 13, 1999 for failing to disclose to Moors & Cabot that he was the subject of an NASD investigation. (CX-28, 11, 44-45).

[5] JM's stepson is an attorney in Virginia. (CX-27, 14).

3

NASDR 003016

### C. Unsuitable Recommendations

Count one of the Complaint alleges that, between October 31, 1995 and August 26, 1996, when he was employed by H.J. Meyers, Respondent made unsuitable recommendations to his customer JM, as listed in Schedule A of the Complaint. The Complaint alleges that the speculative characteristics of the recommended securities did not match the investment objectives and needs of JM.

#### 1. Conduct Rules 2310 and 2110

Conduct Rule 2310(a) provides that, when recommending to a customer "the purchase, sale, or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs."[6] Conduct Rule 2310 also embraces the principle of "fair dealing with customers," which includes a prohibition on excessive trading.[7] A violation of Conduct Rule 2310 is also a violation of Conduct Rule 2110, which requires a member, in the conduct of his business, to observe high standards of commercial honor and just and equitable principles of trade.

#### 2. JM's Financial Objectives and Needs

JM was approximately 85 years old when he opened his account at H.J. Meyers in 1995. (CX-27, 14). He was in poor health and had failing eyesight.[8] (CX-24 at ¶6). JM told his wife

---

[6] Rule 2310(b) clarifies that a broker must make reasonable efforts to obtain information concerning: (1) the customer's financial status; (2) the customer's tax status; (3) the customer's investment objectives, and (4) such other information considered to be reasonable in making recommendations to the customer.

[7] The Board of Governor's policy statement following Rule 2310 specifies that excessive trading clearly violates a broker's responsibility for fair dealing, and that the determination of whether such activity has occurred depends on the individual customer's objectives and financial situation. IM-2310-2.

[8] JM had cataract operations in 1994 and 1995. (CX-24 at ¶6). Although JM could read slowly and with some difficulty, he was not capable of reading fine print. (CX-24 at ¶6).

NASDR 003017

that he originally opened an account with Respondent because he needed more income to pay his increasing medical expenses. (Tr. 45).

JM's widow testified that JM told Respondent, on several occasions, that he wanted "safe stocks."[9] (CX-24 at ¶9). JM's widow further testified that her husband did not propose stock purchases; he followed Respondent's recommendations.[10] (CX-24 at ¶10). Respondent agreed that JM did not call him with stock suggestions. (Tr. 467).

After reviewing all of the evidence, the Hearing Panel concluded that JM had assets of approximately $150,000, and income of less than $15,000.[11]  Based on Respondent's prior relationship with JM at First Albany and his obligation to determine his customer's financial status and investment objectives, the Hearing Panel found that Respondent knew of JM's age, financial objectives, and limited income.  Accordingly, the Hearing Panel concluded that based on JM's health, age, and investment objectives as demonstrated by his past investment history, the recommendations of speculative securities were not suitable for JM.[12]

### 3. JM's Past Investment History

#### (a) McLaughlin, Piven, Vogel Securities, Inc. ("McLaughlin") Account

JM had a relatively conservative portfolio prior to investing with Respondent at H.J. Meyers. (Tr. 87).  JM maintained a brokerage account at McLaughlin from May 19, 1994 to

---

[9] In contrast to the testimony of JM's widow, Respondent stated that JM repeatedly told him that, based on JM's reading of certain magazines, he wanted a "piece of the action." (Tr. 498).

[10] See Clyde J. Bruff, Exchange Act Release No. 40583 (October 21, 1998), 1998 SEC LEXIS 2266 (1998) (De facto control of an account may be established where the client habitually follows the advice of the broker).

[11] Although the October 1995 H.J. Meyers account card indicated that JM had over $700,000 in assets, Respondent admitted that much of the information on the H.J. Meyers account cards was false. (Tr. 461).  The $700,000 asset figure contradicted the asset information, which JM provided to Respondent in March 1995. (CX-8, 1; CX-9).  JM did not sign the H.J. Meyers account card, and there was no evidence that JM reviewed or approved the information on the H.J. Meyers card. (CX-9).

[12] The Hearing Panel determined that assuming JM used the phrase "a piece of the action," as testified by Respondent, JM did not mean that he wanted over 90% of his account invested in speculative securities.

NASDR 003018

August 1996. (CX-7). The McLaughlin account opening card, signed by JM, specified that his

investment objectives were "income" and "safety," and noted that JM had a net worth of between

$50,000 and $100,000, liquid assets of less than $15,000, and an annual income of less than

$15,000. (CX-6). The NASD special investigator testified that JM invested in relatively

conservative securities, such as municipal bonds, bond mutual funds, and mortgage-backed

securities through his McLaughlin account. (Tr. 84-85; CX-7).

### *(b) First Albany Account*

JM opened a brokerage account at First Albany on March 10, 1995, after receiving a

"cold call" from Respondent. (Tr. 86; CX-8, 1). The First Albany account opening card specified

that JM was looking for "total return," that he was prepared to assume "medium risk," and noted

that his net worth was between $50,000 and $100,000. (CX-8, 1). JM signed the First Albany

account card. (CX-8, 1).

During the seven-month period the First Albany account was open, JM engaged in four

purchases of common stock, on March 10, April 27, June 23, and October 13, 1995, ranging

from $4,860 to $6,003 per transaction. (CX-8, 5-9). JM held only one security at any one time,

selling the previously-held security on the same day of a new purchase. (Tr. 87). The level of

turnover in the account was minimal. (Tr. 87). JM exposed no more than $6,003 of his own

funds to market risk in his First Albany account between March 10, 1995 and October 13, 1995.

(Tr. 87). The First Albany account opened with a value of $4,238 and closed on October 27,

1995 with a value of $4,806, prior to the transfer of its assets to H.J. Meyers. (CX-8, 5, 9).

### 4. H. J. Meyers Transactions

After Respondent, who had been JM's representative at First Albany, moved to H.J.

Meyers in August 1995, JM opened a brokerage account at H.J. Meyers on October 31, 1995.

(CX-9, 1; CX-32, 1). The H.J. Meyers new account card specified that JM's objectives were "growth" and "growth and income."[13] (CX-9, 1).

The actual trading activity in JM's H.J. Meyers account is not in dispute. Upon the recommendation of Respondent, JM purchased shares of common stock of Palomar Medical Technologies, Inc. ("Palomar") in the following manner: 2,000 shares at $5.55 per share on November 3, 1995 for $11,115; 1,000 shares at $7.05 per share on December 8, 1995 for $7,065; and 1,000 shares at $5.68 per share on January 22, 1996 for $5,695. (CX-10, 2, 4, 6). JM sold 4,000 shares of Palomar at $8.42 per share on February 16, 1996 for total proceeds of $33,665. (CX-10, 8).

Subsequently, JM purchased an additional 1,000 shares of Palomar at $10.71 per share on February 23, 1996 for $10,725. (CX-10, 8). Over the next six-month period, JM purchased an additional 4,000 shares of Palomar in 10 separate transactions, and sold 2,800 shares of Palomar in four separate transactions over a two month period. (CX-2, 1).

Over the ten-month period from October 1995 to August 1996, Respondent recommended 30 purchases and 18 sales of eight different securities: Palomar; Adaptive Solutions, Inc., Community Medical Transportation, Inc. ("Community Medical"), Magna Lab Class A, Inc., Nashville Country Club, Inc. ("Nashville Country"), Excel Technologies, Inc. ("Excel Tech"), American Materials & Tech Corporation ("American Materials"), and Dynagen, Inc. (CX-2).

### 5. Financial Results

From October 1995 to May 1996, JM's account value increased as a result of Respondent's recommendations. As of November 24, 1995, JM's H.J. Meyers account consisted

---

[13] Although the H.J. Meyers account card included "speculation high degree of risk" as a possible investment objective, this objective was not checked on JM's account card as one his investment objectives.

NASDR 00302(

of 2,000 shares of Palomar valued at $10,126. (CX-10, 1). As of May 31, 1996, JM's H.J. Meyers account had a net value of $60,146.34 consisting of 1,700 shares of Palomar and 3,000 shares of Excel Tech. (CX-10, 14).

On June 25, 1996, JM transferred his relatively conservative investments, i.e., Aim Constellation Fund, Aim Value Fund, Alliance Tech Fund, Alliance Bond Fund U.S. Government, Class A, a unit investment trust, and New York Housing Corp. Municipal Bonds, from his McLaughlin account to his H.J. Meyers account. (CX-10, 18; CX-7, 36-37). After the transfer, the H.J. Meyers account increased from $60,146.34 to $128,606.34 in total assets as of June 28, 1996, consisting of $34,945.20 in municipal bonds, $36,513.39 in mutual funds, $45,040 in common stocks and options, and $9,243.40 in the unit investment trust. (CX-10, 16). The funds and bonds transferred from JM's McLaughlin account were all sold in July 1996. (CX-10, 20-21). The net value of JM's H.J. Meyers account declined from $128,606.34 as of June 28, 1996 to $106,239.62 as of July 26, 1996, consisting of $30,471.35 in municipal bonds, $6,796.84 in mutual funds, $62,085.00 in common stocks and options, and $6,886.43 in cash. (CX-10, 16, 19). The decline in the value of the account was primarily the result of the proceeds from the sale of the mutual funds being used to purchase additional common stock, which declined in value by the end of the month.[14] In August 1996, the common stock positions were liquidated at JM's request. (CX-10, 24-25). The NASD special investigator testified that at the time the securities were sold on an unsolicited basis, they were at higher prices than they would have been had they been sold later on, except for Excel Tech. (Tr. 101).

---

[14] JM purchased 3,500 shares of American Materials on July 5, 1996 at $7.705 per share, which were valued at $5.00 per share at July 26, 1996; JM purchased 1,100 shares of Palomar on July 22, 1996 at $12.015 per share, which were valued at $9.50 per share at July 26, 1996; and JM purchased 2,000 shares of Nashville Country at $5.754 per share on July 16, 1996; which were valued at $5.00 per share at July 26, 1996.

NASDR 003021

After including the transfers from JM's McLaughlin account, JM ultimately suffered a loss of approximately $35,000, which included commissions and/or markups and fees of approximately $25,000. (Tr. 83; CX-5, 4).

### 6. Recommendations Violated Rules 2310 and 2110

H.J. Meyers was a market maker for each of the securities that Respondent recommended to JM, and the Hearing Panel found that the recommended securities set forth in the Complaint were all speculative. (Tr. 93-94). H.J. Meyers' compliance department considered each of the recommended securities a speculative investment. (Tr. 93-94). Respondent admitted in his investigative testimony that the securities were speculative in nature.[15] (Tr. 97). Speculative securities made up ninety percent of JM's portfolio for seven out of the ten months that the H.J. Meyers account was in existence.[16] (Tr. 110).

There is no dispute that JM purchased the securities because of Respondent's recommendations.[17] The Hearing Panel found that it was unsuitable, in violation of Rules 2310 and 2110, for Respondent to recommend that JM invest such a large portion of his portfolio in speculative securities, considering that Respondent knew JM was an 85 year old retiree with a net income of approximately $15,000 and net assets of approximately $150,000.

The Hearing Panel also found that the level of trading in the speculative securities was not consistent with JM's disclosed financial needs or objectives. The Hearing Panel viewed the

---

[15] For the year ended December 31, 1995, Excel Tech, which JM initially purchased on May 7, 1996, had a net loss of $1.59 million or $.21 per share. (CX-12, 14). In H.J. Meyers' January 31, 1996 research newsletter, Adaptive Solutions, Inc., which JM purchased on February 12, and 16, 1996, was described as a speculative buy. (CX-12, 19). In H.J. Meyers' April 30, 1996 research newsletter, Magna Lab Class A, Inc., which JM purchased for the second time on June 17 and June 27, 1996, was described as a speculative buy. (CX-12, 36).

[16] See Clinton Hugh Holland, Exchange Act Release No. 36621 (December 21, 1995), 1995 SEC LEXIS 3452 (1995). (SEC held the high concentration of high risk and speculative securities, predominately underwritten by the broker's firm, was not suitable for an 82 year old widow, who did not depend on the income from her investments for her living expenses and who held a portion of her assets outside her brokerage account.)

[17] Respondent testified that he recommended the transactions listed in the exhibit. (Tr. 467).

NASDR 003022

repeated purchasing and then selling of Palomar, Community Medical, Magna Lab Class A, Inc.,

Nashville Country, and Excel Tech after relatively short holding periods as excessive trading.[18]

Respondent acknowledged that H.J. Meyers emphasized "quick turnover" in the accounts.

(Tr. 450).

The average holding period for the securities in JM's account was 40 days. (Tr. 80).

Using a modified Looper analysis, JM's account was turned over approximately 8.5 times on an

annual basis. (CX-4). The SEC has indicated that a turnover rate of six generally indicates

excessive trading.[19] The average equity in the JM's H.J. Meyers account was approximately

$56,000. (Tr. 83). The annualized cost to equity ratio was .54, i.e., the minimum rate of return

necessary to cover annual account costs was 54%. (Tr. 108; CX-5). The SEC has previously held

that a cost to equity ratio in excess of 20% indicates excessive trading.[20]

Even if JM wished to engage in trading that was not consistent with his financial needs

and investment goals, i.e., "get a piece of the action," as suggested by Respondent, a registered

representative is required to counsel the customer in a manner consistent with his financial

---

[18] JM purchased 300 shares of Community Medical on December 14, 1995, and sold the shares on February 12, 1996. (CX-10, 4, 8). JM purchased 400 shares of Adaptive Solutions, Inc. on February 12, 1996 and an additional 4,500 shares on February 16, 1996, which he sold on March 7, and 14, 1996. (CX-10, 8, 10).

JM purchased 1,000 shares of Magna Lab Class A, Inc. on March 5, 1996 and an additional 1,000 shares on March 14, 1996, all of which he sold on March 27, 1996. (CX-10, 9-10). He then purchased 1,700 shares of Magna Lab Class A, Inc. on June 17, 1996 and an additional 3,300 shares on June 27, 1996, 2,500 of which he sold on July 22, 1996. (CX-10, 17, 18, 21).

JM purchased 1,000 shares of Excel Tech on May 7, 1996, which he sold on May 10, 1996. (CX-10, 14). On May 28, and 31, 1996, he purchased an additional 1,000 and 2,000 shares of Excel Tech, respectively, 1,500 shares of which he sold on June 27, 1996. (CX-10, 14, 18). He purchased 2,000 shares of Nashville Country on May 3, 1996, which he sold on May 15, 1996. (CX-10, 14). On July 16, 1996, he purchased an additional 2,000 shares of Nashville Country. (CX-10, 21).

JM purchased 3,500 shares of American Materials on July 5, 1996, then he purchased an additional 1,500 shares on July 8, 1996. (CX-10, 20). He purchased 5,000 shares of Dynagen, Inc. on August 21, 1996. (CX-10, 24).

[19] See Peter C. Bucchieri, Exchange Act Release No. 37218 (May 14, 1996), 1996 SEC LEXIS 1331 (1996) (SEC found excessive trading in accounts with cost to equity factors of 20% to 30%).

[20] Id.

10

NASDR 003023

situation.[21] Respondent was obligated to tailor his recommendations to JM's financial profile and investment objectives.[22]

Respondent's recommendations to JM, as set forth on Schedule A of the Complaint, did not meet his obligation to make customer specific determinations of suitability both in terms of the types of securities recommended and the number of transactions recommended. Respondent's recommendations to JM were clearly unsuitable and violated Conduct Rules 2110 and 2330.

**D. Inaccurate Form U-4s**

    1. <u>Obligation to File and Update Form U-4</u>

An individual files a Uniform Application for Securities Industry Registration or Transfer ("Form U-4") with the NASD when, among other things, changing employment or association. (CX-28, 13). Amendments to Form U-4s are required to be filed to correct deficiencies in previous filings and to update and keep current the information required by the Form U-4. (CX-28, 13).

Count two of the Complaint alleges that: (i) while employed by National Securities Corporation between July 1998 and October 1998, Respondent failed to update his Form U-4 to include information concerning the NASDR investigation of JM's complaint; (ii) in response to Question 22I(1) on the Form U-4 filed on November 2, 1998, Respondent falsely checked "no"; and (iii) Respondent continued to fail to amend the Form U-4 filed with Moors & Cabot to reflect a "yes" answer to Question 22I(1). Question 22I(1) of Form U-4 asks "Have you been

---

[21] See <u>District Bus. Conduct Comm. for Dist. No. 9 v. Michael R. Euripides</u>, Complaint No. C9B950014, 1997 NASD Discip. LEXIS 45 (NBCC, July 28, 1997).

[22] <u>Id</u>.

notified in writing, that you are now the subject of any investigation, regulatory complaint, or proceeding that could result in a 'yes' answer to any part of 22A, B, D, E, or F?" (CX-28, 17).

The NASDR staff sent Respondent a July 25, 1997 "Wells" letter, advising Respondent that the staff was considering recommending formal disciplinary action against him based on violations of Conduct Rules 2110 and 2310 in connection with his unsuitable recommendations to customer JM. (CX-28, 33). The NASDR staff received a signed receipt indicating the letter was delivered on July 26, 1997, during the period when Respondent was changing employment from H.J. Meyers to The Boston Group.[23] (CX-28, 33A).

Subsequent to the Wells letter, in a <u>Notice to Members</u>, 98-27, dated March 1998, the NASD amended Form U-4, effective March 16, 1998, to define the term "investigation" in Question 22I(1) to include "NASD Regulation Inc. investigations after a Wells notice has been given or after an associated person has been advised by the staff that it intends to recommend formal disciplinary action." (CX-28, 25). The March 1998 Notice stated that anyone who had previously been given a "Wells" notice by the NASDR staff relating to a pending investigation was obligated to check "yes" to Question 22I(1) the next time any amendment to the Form U-4 was filed or upon the filing of a new Form U-4 to effect a transfer.[24] (CX-28, 22).

---

[23] After H.J. Meyers' Boston office closed in June 1997, Respondent signed a Form U-4 relating to his employment with The Boston Group on July 29, 1997. (CX-28, 55). Respondent failed to respond to the Question 22I: "[a]re you now the subject of any complaint, investigation, or proceeding that could result in a "yes" answer to parts A-H of this item." (Tr. 140; CX-28, 54). On August 22, 1997, Respondent amended the Form U-4 to reflect a "no" answer to the Question 22I(1). (CX-28, 41).

[24] Pursuant to the March 1998 Notice, Respondent's required answer to Question 22I(1) on The Boston Group Form U-4 changed from a "no" answer to a "yes" answer. Respondent was not required to file an immediate amendment to update The Boston Group Form U-4 because the need to update Question 22I(1) resulted not from a change in Respondent's circumstances, but from an expansion of the scope of the term investigation in Question 22I(1). Question 22I(1) investigations now included situations in which the NASD staff advised an associated person that it intended to recommend formal disciplinary action. (CX-28, 5).

NASDR 003025

### 2. Failed to Update Form U-4 after July 24, 1998

On July 24, 1998, there was a mass transfer of registrations from The Boston Group to the National Securities Corporation.[25] (CX-28, 39). In connection with the transfer, Respondent failed to update his Form U-4 to indicate that he was subject to a pending investigation based on Respondent's receipt of the 1997 Wells letter and the March 1998 Notice. In explanation of the failure to update the inaccurate Form U-4, Respondent described the transfer as "I woke up one morning" and the office had changed from The Boston Group to the National Securities Corporation. (Tr. 511).

The Hearing Panel determined that Respondent's failure to update the Form U-4 after July 24, 1998 was a technical violation. The Hearing Panel determined that Respondent should not be sanctioned because the transfer was part of a wholesale transfer that Respondent did not control and was not aware of the transfer prior to its completion.

However, on October 15, 1998, the NASDR staff sent Respondent a letter that, among other things, advised him to update his Form U-4 to reflect a "yes" answer to Question 22I(1). (CX-28, 61). Respondent acknowledged that he received the letter. (Tr. 400). Respondent, nevertheless, failed to update the Form U-4 to reflect the NASD investigation.[26]

### 3. Inaccurate Form U-4 filed on November 2, 1998

Respondent became associated with Moors & Cabot in October 1998. On November 2, 1998, Moors & Cabot filed a Form U-4 that inaccurately showed a "no" answer to Question 22I(1) on behalf of Respondent. Respondent denied that he was responsible for the inaccurate

---

[25] The Boston Group filed a Form U-5 on behalf of Respondent on July 24, 1998. (CX-28, 6). The Form U-5 failed to disclose the pending NASDR investigation. (CX-28, 6). Enforcement did not allege in the Complaint that the July 24, 1998 Form U-5 was inaccurate.

[26] The National Securities Corporation filed a Form U-5 on behalf of Respondent on October 26, 1998. (CX-39). The Form U-5 failed to disclose the pending NASDR investigation. (CX-39). Enforcement did not allege in the Complaint that the October 26, 1998 Form U-5 was inaccurate.

NASDR 003026

information. Respondent stated that because he was not sure of the answer to Question 22I(1) that he probably left the question blank and signed and returned the form to the Moors & Cabot registration clerk, Ms. Fiore. (Tr. 395). Respondent is certain that the check marks made by Question 22I(1) were not made by him. (Tr. 397).

A newly hired Moors & Cabot registered representative completes his Form U-4 by hand. (Tr. 215). Subsequently, the registration clerk reviews the Form U-4 to insure it is complete. (Tr. 215). Ms. Fiore testified that, if something is wrong, she brings it to the representative's attention immediately. (Tr. 215). After she receives the completed and signed Form U-4, she delivers it to the branch manager for his signature. (Tr. 220). After the branch manager signs the form, she files the Form U-4 with the Association. (Tr. 220). Ms. Fiore remembers speaking to Respondent several times concerning his employment documents. (Tr. 221). She does not remember whether she specifically discussed the Form U-4 with Respondent.

Ms. Fiore acknowledged that she could have made the check mark answering "no" to Question 22I(1) on the November 2, 1998 Form U-4, but only after noting that the question was left blank and checking with Respondent concerning the correct answer. (Tr. 242). She stated emphatically that she would not have made a change on page 3 of the Form U-4, which includes Question 22I(1), without the broker's approval.[27] (Tr. 216). She also stated that she did not remember checking the "no" answer to Question 22I(1) on Respondent's Form U-4. (Tr. 231).

Respondent, by permitting Moors & Cabot to file the Form U-4 on his behalf, caused a Form U-4 to be filed that was inaccurate, in that it failed to disclose that he was the subject of an investigation. The burden of updating a Form U-4 rests with the registered person.[28] Even if

---

[27] Ms. Fiore has been employed by Moors & Cabot for over 21 years. (Tr. 214). She has been completing Form U-4s for over 30 years. (Tr. 216). She has never been accused of changing a Form U-4 before. (Tr. 213).

[28] District Bus. Conduct Comm. for Dist. No. 10. v. Gershon Tannebaum, Complaint No. C10900035 (NY-9088)(NBCC, March 4, 1992), 1992 NASD Discip. LEXIS 118.

NASDR 003027

Respondent did not physically check the "no" answer, he is responsible for the inaccurate information because (i) he should have checked "yes" to the Question 22I(1), based on the October 15, 1998 letter he received; (ii) he admitted he did not check the "yes" answer to Question 22I(1), and (iii) he knew the Form U-4 would be filed. The NASD has indicated that a person who provides information for a regulatory filing and executes that filing is responsible for ensuring that the information contained therein is accurate.[29]

The Hearing Panel, based on the evidence before it, found that Respondent either checked "no" to Question 22I(1) on the Form U-4 filed on November 2, 1998, or permitted Ms. Fiore to check "no" to the question. In either circumstances, the Hearing Panel concluded that Respondent caused the filing of an inaccurate Form U-4 and thereby violated Rule 2110. The Hearing Panel also concluded that Respondent subsequently violated Rule 2110 by failing to file an amendment to the November 2, 1998 Form U-4 to correct the error.

### III. Sanctions

Enforcement proposed that Respondent Howard be fined $10,000 and suspended for one year for the two counts.

### A. Unsuitable Recommendations

The Sanction Guidelines for "Suitability - Unsuitable Recommendations" recommend a fine of $2,500 to $50,000.[30] In addition, in cases involving clearly unsuitable securities and no prior similar misconduct, the Guidelines recommend that the adjudicator should consider a suspension of 10 to 30 business days. In egregious cases, the Sanction Guidelines recommend that a longer suspension of up to two years or a bar should be considered.

---

[29] See Robert E. Kauffman, Exchange Act Release No. 33219 (November 18, 1993), aff'd sub nom, Robert E. Kauffman v. S.E.C., 40 F.3d 1240 (3rd Cir. 1994).

[30] NASD Sanction Guidelines, 83 (1998).

NASDR 003028

### 1. Aggravating Factors

The Hearing Panel noted several aggravating factors. The customer injured by Respondent's misconduct was 85 years old and relatively unsophisticated.[31] Respondent made the unsuitable recommendations over a ten month period.[32] Respondent failed to accept responsibility for and acknowledge his misconduct until the Hearing.[33]

The most aggravating factor was Respondent's subsequent attempts to intimidate his customer.[34] JM drafted an August 27, 1996 complaint letter to H.J. Meyers, which alleged, among other things, that Respondent stole checks from JM's home and forged the checks.[35] (CX-22; RX-76). On December 6, 1996, JM executed a settlement with H.J. Meyers, in which he released all claims against H.J. Meyers and its employees. After the settlement, Respondent filed a small claims complaint against JM in East Hampton, New York, for slander, libel, and conspiracy to commit bank fraud on December 13, 1996. (CX-29, 3). During the same period, on December 16, 1996, Respondent wrote a letter to the Fairfax County Virginia Police Department, copying the Federal Bureau of Investigation, and the Virginia State Attorney General, complaining that JM's stepson threatened him over the phone and slandered him by calling Respondent's employer, H.J. Meyers. (CX-29, 14).

---

[31] NASD Sanction Guidelines, Principal Consideration No. 19, p. 9 (1998).

[32] NASD Sanction Guidelines, Principal Consideration No. 9, p. 8 (1998).

[33] NASD Sanction Guidelines, Principal Consideration No. 2, p. 8 (1998).

[34] NASD Sanction Guidelines, Principal Consideration No. 10, p. 9 (1998).

[35] JM's complaint letter to H.J. Meyers alleged that Respondent removed two blank checks from JM's home, without his knowledge, and Respondent executed the MBNA bank checks in the amount of $4,000 each and deposited them in JM's H.J. Meyers brokerage account on July 17, 1996. (RX-76). A representative from the MBNA bank advised H.J. Meyers on September 4, 1996 that the claims that the signatures on checks were forged were without merit. (RX-57, 3).

NASDR 00302

While the East Hampton case was pending, Respondent filed a lawsuit in Fairfax County Virginia against JM's stepson for slander, libel, conspiracy to commit bank fraud, and defamation of character on January 28, 1997. (CX-29, 14). The General District Court of Fairfax County Virginia entered a judgment for JM's stepson on May 5, 1997, which Respondent immediately appealed. (CX-29, 15). After the East Hampton court dismissed Respondent's small claims complaint on March 10, 1997, he appealed the decision on April 24, 1997.[36] (CX-29, 4-5). The East Hampton court dismissed the appeal on November 18, 1997. (CX-29, 11).

While the East Hampton decision was on appeal, Respondent filed small claims complaints against JM and JM's stepson in the District Court of Cambridge Massachusetts on May 1, 1997. (CX-29, 17, 18). The basis for both claims were malicious interference with contract, slander per se, libel per se, harassment, and conspiracy to commit bank fraud. (CX-29, 17, 18).

JM's widow testified that prior to his death JM was overwhelmed by the number of law suits following the settlement. (Tr. 49). The Hearing Panel viewed Respondent's continuous legal actions directed at JM and JM's stepson, after the March 1997 East Hampton decision, as both a failure by Respondent to acknowledge his own misconduct, and an attempt to intimidate his customer.

---

[36] The East Hampton judge, after reciting the release executed by H.J. Meyers in the settlement, the initiation of an FBI investigation of JM by Respondent concerning the same allegations, and the existence of a similar claim in a court in Virginia, stated: "All these facts bring this court to the conclusion that [Respondent] herein had no basis for bringing the instant action against [JM] other than to harass him, which in view of [JM's] age (88) is no small matter." (CX-29, 3).

NASDR 003030

## 2. Mitigating Factors

The Hearing Panel also noted several mitigating factors.[37]  When JM accepted

Respondent's recommendations, Respondent may not have initially realized that JM was

physically incapable of reading the corporate prospectuses that Respondent provided regarding

the recommended securities, and, therefore, Respondent was not a sophisticated investor.[38] (CX-

24 at ¶ 10).  JM did not readily admit that he had difficulty reading.[39] (Tr. 34).  During the last

two years of his life, JM had a difficult time understanding and coping with his affairs.[40]

At the Hearing, for the first time Respondent acknowledged his responsibility for the

unsuitable trading in the account.  Respondent stated that "in an atmosphere of H.J. Meyers when

everyone around you is screaming and yelling and trading stocks, . . . you tend to go, maybe cross

over the line." (Tr. 447-448).  H.J. Meyers was heavily involved in Palomar and strongly

encouraged its representatives to place Palomar with their customers.[41]  The Hearing Panel

believes that, in part, because of the pressure from H.J. Meyers and the substantial initial gains

generated by the securities, Respondent believed that the securities were a good investment.

Although succumbing to such pressure does not excuse the violation, it may be taken into

consideration in determining the sanctions.  Based on Respondent's testimony, the Hearing Panel

---

[37] Respondent had no relevant disciplinary history in the prior 13 years.  See Mark S. Balbirer, No. C07980011 (NAC, October 18, 1999) (NAC held that although the existence of disciplinary history is an aggravating factor, the lack of a disciplinary history is not a mitigating factor.)

[38] NASD Sanction Guidelines, Principal Consideration No. 19, p. 9 (1998).

[39] JM's widow testified that, in 1996, she discovered JM was not reading the books that she brought him; he was just holding them. (Tr. 37).

[40] JM's widow testified that JM spent a great deal of time responding to sweepstakes applications and believed that he had won a sweepstakes. (CX-24 at ¶ 13).

[41] H.J. Meyers provided a script for its representatives to solicit purchases of Palomar stock. (CX-14, 1).  The tactics of encouragement varied from the supervisor patrolling the halls with a small baseball bat, to requiring representatives to sell a certain amount of securities before they could leave the building, to locking representatives out if they were not in the office by 8:00 a.m. (Tr. 445).  There were also certain "quotas" imposed on the brokers at H.J. Meyers. (Tr. 444).

NASDR 003031

believes that it is unlikely that Respondent will associate with a brokerage firm engaging in
similar sales practices in the future. (Tr. 464).

Finally, the Hearing Panel noted that Respondent assisted the Massachusetts Securities
Division in initiating the closing of H.J. Meyers' Boston office. (Tr. 452).

### 3. Conclusion

The Hearing Panel determined that Respondent did not make the recommendations solely
to earn commissions.[42] Nevertheless, the recommendations of speculative securities and the
level of trading were clearly unsuitable for an 85 year old retiree.

The Hearing Panel viewed Respondent's continuing efforts to penalize JM for his
unwarranted stealing and forgery allegations, set forth in his August 27, 1996 complaint letter to
H.J. Meyers, as extremely intimidating in light of the East Hampton Judge's April 24, 1997
opinion. Respondent was understandably outraged at the allegations that he had stolen checks
from JM's home and forged his signature and made unauthorized transactions in JM's account.
It is unfortunate that in drafting the original complaint letter JM and his stepson accused
Respondent of forging checks and unauthorized transactions.[43]

Noting that the misconduct of others cannot excuse the misconduct of Respondent, the
Hearing Panel viewed Respondent's response to JM's objections to the clearly unsuitable
recommendations, i.e., the multiple lawsuits, as an egregious effort to intimidate JM.
Accordingly, the Hearing Panel fined Respondent $17,500 and suspended him for 90 days for the
unsuitable recommendations.

---

[42] H.J. Meyers paid Respondent between 40% and 50% of the $25,000 in markups and fees paid by JM. (Tr. 112).
Respondent earned one sixth of the $60,000 he earned from January 1996 to August 1996 based on transactions in
JM's account. (Tr. 112).

[43] JM confirmed on August 26, 1996 that all the trades were authorized. (RX-10).

19

NASDR 003032

**B. Inaccurate Form U-4s**

     The NASD Sanction Guidelines recommend a fine of between $2,500 and $50,000, and the consideration of a suspension for 5 to 30 business days for filing false, misleading, or inaccurate forms or amendments.[44]  In egregious cases, the Sanction Guidelines suggests a longer suspension in any or all capacities (of up to two years) or a bar.[45]

     With respect to his failure to update his Form U-4 after July 24, 1998 and his responsibility for the filing of inaccurate information on the November 2, 1998 Form U-4, Respondent initially failed to acknowledge any misconduct on his part.

### 1. Failure to update Form U-4 after July 24, 1998

     Respondent argued that there were no forms to fill out in connection with his transfer to National Securities Corporation and that shortly thereafter the office closed. (Tr. 512). At the Hearing, he acknowledged that checking with the National Securities Corporation's compliance officer and updating his Form U-4 after July 24, 1998 was the last thing on his mind at that point, but now he knows better. (Tr. 514). The Hearing Panel noted that the October 15, 1998 letter, directing Respondent to update his Form U-4, was received just prior to Respondent's employment by Moors & Cabot.

### 2. Inaccurate November 2, 1998 Form U-4

     Respondent stated that he was afraid to mention the October 15, 1998 letter during his employment interview with Moors & Cabot.[46] (Tr. 405).  He explained that he did not have the

---

[44] NASD Sanction Guidelines, 65 (1998).

[45] NASD Sanction Guidelines, 66 (1998).

[46] In his interview with Moors & Cabot, Respondent indicated that H.J. Meyers was under regulatory scrutiny by the Massachusetts Securities Division, which resulted in a number of customer complaints that H.J. Meyers settled quickly, including JM's complaint. (Tr. 172-173).

NASDR 00303

funds to consult counsel, and he was unwilling to ask NASDR staff the meaning of the October 15, 1998 letter without the advice of counsel. (Tr. 410).

Respondent also argued that he truly believed the NASDR had closed the investigation.[47] The Hearing Panel, however, viewed Respondent's statement that he failed to answer "no" to Question 22I(1) on the November 2, 1998 Form U-4 as an indication that he had some doubts about whether the investigation was over. (Tr. 551).

In addition to failing to acknowledge his misconduct, Respondent initially blamed others entirely for the inaccurate November 2, 1998 Form U-4. Respondent stated, in a February 1, 1999 letter to the Criminal Investigations Unit of the Internal Revenue Service, that the Moors & Cabot registration clerk, Ms. Fiore, forged the Form U-4. (RX-28). Respondent repeated this allegation in his March 29, 1999 motion in opposition to Enforcement's motion for summary judgment. Specifically, Respondent stated that he did not sign, nor approve, nor mail to NASDR, the documents forged by Moors & Cabot employee, Carole Fiore.

At the Hearing, Respondent simply stated that Ms. Fiore checked the "no" answer to Question 22I(1) without his approval. (Tr. 402). Respondent gave no explanation why he did not correct the inaccurate November 2, 1998 Form U-4.

### 3. Conclusion

Taking into consideration the receipt of the October 15, 1998 letter, which directed Respondent to answer "yes" to Question 22I(1), and the admitted failure of Respondent to answer "yes" to Question 22(1), the Hearing Panel fined Respondent $7,500 and suspended him 90 days for the inaccurate Form U-4s.

---

[47] Respondent stated he was led to believe that NASDR closed the investigation based on a September 1997 conversation with an NASDR Washington Office staff member. (Tr. 407). The staff member told Respondent that, at the time NASDR wrote the Wells letter, NASDR was not aware that Respondent was a witness for the Massachusetts Securities Division. (Tr. 406).

NASDR 003034

### IV. Conclusion

Based on the evidence submitted at the Hearing and the factors discussed above, the Hearing Panel fined Respondent $17,500 and suspended him for 90 days for the unsuitable recommendations and fined him $7,500 and suspended him an additional 90 days for the inaccurate Form U-4s for a total fine of $25,00 and a total suspension of 180 days.[48] Respondent also was assessed $3,484.25, consisting of a $750 administrative fee and a $2,734.25 transcript fee, as the cost of the Hearing.

These sanctions shall become effective on a date determined by the Association, but not sooner than 30 days from the date this decision becomes the final disciplinary decision of the NASD.[49]

**SO ORDERED.**

**HEARING PANEL**

by: Sharon Witherspoon
Hearing Officer

Dated:         Washington, DC
               December 1, 1999

Copies to:
Daniel R. Howard (via Airborne Express and first class mail)
John M. D'Amico, Esq. (via electronically and first class mail)
Rory C. Flynn, Esq. (via electronically and first class mail)

---

[48] Respondent has been unemployed since January 1999. Consequently, the Hearing Panel determined that an installment plan was appropriate. Consistent with the NASD Policy regarding Imposition and Collection of Monetary Sanctions set forth in Notice to Members 99-86, after the 180 day suspension is completed, Respondent is directed to pay $500 on the first day of the first six months following the suspension and then pay installments of $1,000 per month thereafter until the full $25,000 fine is paid. As long as Respondent adheres to the payment plan, the 180 day suspension should not be extended for failure to pay the fine.

[49] The Hearing Panel has considered all of the arguments of the Parties. They are rejected or sustained to the extent that they are inconsistent or in accord with the views expressed herein.