Exhibit B

NASDR 003221



Joan C. Conley
Senior Vice President and Corporate Secretary
(202) 728-8381-Direct
(202) 728-8894-Fax

November 16, 2000

**VIA CERTIFIED MAIL:**
**RETURN RECEIPT REQUESTED/FIRST-CLASS MAIL**

Mr. Daniel Richard Howard
4 Canal Park
Cambridge, MA 02141

and

443 West 50th Street
Apt. 957
New York, NY 10019

      Re:    **Complaint No. C11970032: Daniel Richard Howard**

Dear Mr. Howard:

Enclosed herewith is the decision of the National Adjudicatory Council in the above-referenced matter. The NASD Board of Governors did not call this matter for review, and the attached decision is the final decision of the NASD.

This is to advise you that your two-year suspension shall begin with the opening of business on Tuesday, January 2, 2001 and end on Wednesday, January 1, 2003. Please note that under IM-8310-1 ("Effect of a Suspension, Revocation or Bar"), you are not permitted to associate with any NASD member firm in any capacity, including a clerical or ministerial capacity during the period of your suspension. Further, member firms are not permitted to pay or credit any salary, commission, profit or other remuneration that results directly or indirectly from any securities transaction that you may have earned during the period of suspension.

Pursuant to Article IV, Section 2 of the NASD By-Laws, if you are currently employed with a member of the NASD, you are required immediately to update your Form U-4 to reflect this action.

NASDR 003222

You are also reminded that failure to keep the NASD apprised of your most recent address may subject you to entry of a default decision. Article V, Section 2 of the NASD By-Laws requires all persons who apply for registration with the NASD to submit a Form U-4 and to keep all information on the Form U-4 current. Accordingly, you must keep your member firm apprised of your current address. In addition, the NASD may request information from, or file a formal disciplinary action against, persons who are no longer registered with a member for at least two years after their termination from the member (Article V, Sections 3 and 4 of the NASD's By-Laws). Requests for information and disciplinary complaints issued by the NASD during this two-year period will be mailed to such a person's last address in the NASD's records, and are deemed to have been received at that address, whether or not the individual has actually received them. Thus, individuals who are no longer associated with an NASD member firm and who have failed to update their addresses for a least two years after they end their association are subject to the entry of a default decision against them. See *Notice to Members 97-31*. Letters notifying the NASD of such address changes should be sent to:

> CRD
> P.O. Box 9495
> Gaithersburg, MD 20898-9401 Further, pursuant to Article V, Section

If the decision contains any findings against you, you may appeal this decision to the U.S. Securities and Exchange Commission ("SEC"). To do so, you must file an application with the Commission within thirty days of your receipt of this decision. A copy of this application must be sent to the NASD Regulation, Inc. ("NASD Regulation") Office of General Counsel as must copies of all documents filed with the SEC. Any documents provided to the SEC via fax or overnight mail should also be provided to NASD Regulation by similar means.

| The address of the SEC is: | The address of NASD Regulation is: |
| --- | --- |
| Office of the Secretary | Attn: James S. Wrona, Esq. |
| U.S. Securities and Exchange | Office of General Counsel |
| Commission | NASD Regulation, Inc. |
| 450 Fifth Street, N.W., Stop 6-9 | 1735 K Street, N.W. |
| Washington, D.C. 20549 | Washington, D.C. 20006 |

If you file an application for review with the SEC, the application must identify the NASD Regulation case number and set forth in summary form a brief statement of alleged errors in the determination and supporting reasons therefor. You must include an address where you may be served and phone number where you may be reached during business hours. If your address or phone number changes, you must advise the SEC and NASD Regulation. Attorneys must file a notice of appearance.

NASDR 003223

Questions regarding the appeal process may be directed to the Office of the Secretary at the SEC. The phone number of that office is 202-942-7070.

If the National Adjudicatory Council decision orders you to pay fines and/or costs, you do not need to pay these amounts until after the 30-day period for appeal to the SEC has passed. Any fines and costs assessed should be paid to the National Association of Securities Dealers, Inc., Department #0651, Washington, D.C. 20073-0651.

Very truly yours,

Joan C. Conley
Senior Vice President and Corporate Secretary

cc:    John D'Amico, Esq.

NASDR 003224

BEFORE THE NATIONAL ADJUDICATORY COUNCIL

NASD REGULATION, INC.

| | |
|---|---|
| Department of Enforcement,<br><br>                              Complainant,<br><br>                    v.<br><br>Daniel Richard Howard<br>4 Canal Park<br>Cambridge, Massachusetts  02141,<br><br>                              Respondent. | DECISION<br><br>Complaint No. C11970032<br><br>Dated: November 16, 2000 |

**Registered representative made unsuitable recommendations and filed an inaccurate Form U-4.  Held, findings upheld and sanctions modified in part.**

Daniel Richard Howard ("Howard") appealed the December 1, 1999 decision of a Hearing Panel.  After reviewing the entire record in this matter, we hold that Howard made unsuitable recommendations and filed an inaccurate Uniform Application for Securities Industry Registration or Transfer form ("Form U-4") with NASD Regulation, Inc. ("NASD Regulation").  We impose on Howard a two-year suspension in all capacities and a $17,500 fine for the suitability violation; and a 90-day suspension in all capacities, to run concurrently with the two-year suspension for the suitability violation, and a $7,500 fine for the inaccurate Form U-4 filing.

Background

Howard was first registered with the NASD as a general securities representative in April 1983.  He was registered in that capacity at the following firms on the following dates:  First Albany Corporation ("First Albany") from June 1990 to August 1995; H.J. Meyers & Co. ("H.J. Meyers") from August 1995 to July 1997; The Boston Group from July 1997 to July 1998; the National Securities Corporation from July 1998 to October 1998; and Moors & Cabot, Inc. ("Moors & Cabot") from October 1998 to January 1999.  Howard is not currently employed in the securities industry.

NASDR 003225

- 2 -

Factual and Procedural History

The Department of Enforcement ("Enforcement") of NASD Regulation filed a two-count complaint against Howard on January 7, 1999. The complaint alleged that Howard had (i) violated Conduct Rules 2110 and 2310 by recommending purchases and sales of speculative securities to customer JM without having reasonable grounds for believing that the transactions were suitable for the customer; and (ii) violated Conduct Rule 2110 by filing inaccurate Form U-4s.[1]  Howard filed an answer to the complaint denying the substantive allegations.  The parties presented evidence during a two-day hearing.[2]  The evidence related to the two distinct causes of action is discussed separately below.

Unsuitable Recommendations.  Customer JM was approximately 85 years old when he opened his account at H.J. Meyers in 1995.  He was in poor health and had failing eyesight.[3]  Customer JM told his wife that he had originally opened an account with Howard because he needed more income to pay his increasing medical expenses.[4]  Customer JM had assets of approximately $150,000 and an annual income of approximately $15,000 during the relevant period.[5]

---

[1]      The NASD Regulation investigation that culminated in the filing of the complaint began as a result of customer JM's complaint letter alleging that Howard had engaged in improper conduct in relation to customer JM's account at H.J. Meyers.

[2]      Enforcement presented five witnesses: the NASD special investigator; customer JM's widow; and three Moors & Cabot employees -- the compliance director, the registration clerk, and the Boston office branch manager.  (Customer JM died in November 1998, after the period of the alleged unsuitable recommendations.)  Howard, in addition to testifying himself, presented two witnesses: a former branch manager of H.J. Meyers, who was hired subsequent to the relevant period, and an attorney who had spoken with JM's stepson.

[3]      Customer JM had cataract operations in 1994 and 1995.  Although he could read slowly and with some difficulty, he was not capable of reading fine print.

[4]      As noted above, customer JM passed away prior to the hearing in this matter.

[5]      Although the October 1995 H.J. Meyers opening account card indicated that customer JM had more than $700,000 in assets, Howard admitted that many of the account cards at H.J. Meyers contained inaccurate information.  He could not recall whether the information contained in customer JM's H.J. Meyers account card was inaccurate.  We note, however, that customer JM did not sign the H.J. Meyers account card, and there was no evidence that he reviewed or approved the information on the H.J. Meyers card.  Moreover, as discussed infra, the record contains two opening account cards for other broker-dealers, including one at which Howard was employed as a registered representative, that were signed by customer JM and that indicate that he had a net worth of between $50,000 and $100,000, liquid assets of less than $15,000, and an annual income of less than $15,000.  The Hearing Panel that acted as the initial trier of fact during the proceedings below found that customer JM had assets of approximately $150,000 and income of less than $15,000.  We find no reason to alter the Hearing Panel's finding in this regard and we thus use the same figures.

NASDR 003226

- 3 -

Customer JM's widow testified that customer JM had told Howard that he was interested in investing in "safe stocks."[6]  Customer JM's widow further testified that her husband had followed Howard's recommendations and did not initiate transactions on his own.  Howard agreed that customer JM did not call him with stock suggestions.  Howard also admitted that he had recommended the securities transactions at issue.

Enforcement presented evidence of customer JM's trading at McLaughlin, Piven, Vogel Securities, Inc. ("McLaughlin"), where he had an account prior to his investing with Howard at H.J. Meyers.  This evidence indicated that customer JM had a relatively conservative portfolio prior to investing with Howard at H.J. Meyers.  Customer JM had maintained the McLaughlin account from May 1994 to August 1996.  The McLaughlin account opening card, signed by customer JM, specified that his investment objectives were "income" and "safety," and noted that he had a net worth of between $50,000 and $100,000, liquid assets of less than $15,000, and an annual income of less than $15,000.  An NASD Regulation special investigator testified that customer JM invested in relatively conservative securities, such as municipal bonds, bond mutual funds, and mortgage-backed securities through his McLaughlin account.

Customer JM opened a brokerage account with Howard at First Albany in March 1995, after receiving a "cold call" from Howard.  The First Albany account opening card that was signed by customer JM specified that he was looking for "total return," that he was prepared to assume "medium risk," and that his net worth was between $50,000 and $100,000.

During the seven-month period the First Albany account was open, customer JM engaged in four purchases of common stock, on March 10, April 27, June 23, and October 13, 1995, investing from $4,860 to $6,003 per transaction.  Customer JM held only one security at any one time, selling the previously-held security on the same day of a new purchase.  The level of turnover in the account was minimal.  The First Albany account opened with a value of $4,238 and closed on October 27, 1995 with a value of $4,806, prior to the transfer of its assets to H.J. Meyers.

After Howard moved to H.J. Meyers in August 1995, customer JM opened a brokerage account at H.J. Meyers on October 31, 1995.  The H.J. Meyers new account card specified that customer JM's objectives were "growth" and "growth and income."

The actual trading activity in customer JM's H.J. Meyers account is not in dispute.  Over the 10-month period from October 1995 to August 1996, customer JM accepted Howard's recommendations to execute 30 purchases and 18 sales of eight different securities, including the following:  Palomar Medical Technologies, Inc. ("Palomar"); Adaptive Solutions, Inc.; Community Medical Transportation, Inc. ("Community Medical"); Magna Lab Class A, Inc.; Nashville Country Club, Inc. ("Nashville Country"); Excel Technologies, Inc. ("Excel Tech"); American Materials & Tech Corporation ("American Materials"); and Dynagen, Inc.

---

[6]      In contrast to the testimony of customer JM's widow, Howard stated that customer JM repeatedly told him that he wanted a "piece of the action."

The trading in customer JM's account was particularly active with regard to Palomar securities. For instance, pursuant to Howard's recommendations, customer JM purchased shares of common stock of Palomar as follows: 2,000 shares at $5.55 per share on November 3, 1995 for $11,115; 1,000 shares at $7.05 per share on December 8, 1995 for $7,065; and 1,000 shares at $5.68 per share on January 22, 1996 for $5,695. Customer JM sold 4,000 shares of Palomar at $8.42 per share on February 16, 1996 for total proceeds of $33,665. Customer JM then purchased an additional 1,000 shares of Palomar at $10.71 per share on February 23, 1996 for $10,725. Over the next six-month period, customer JM purchased an additional 4,000 shares of Palomar in 10 separate transactions, and sold 2,800 shares of Palomar in four separate transactions.

On June 25, 1996, customer JM transferred the investments that he held in his McLaughlin account from McLaughlin to his H.J. Meyers account. At the time of the transfer, customer JM's McLaughlin account consisted of the following investments: Aim Constellation Fund, Aim Value Fund, Alliance Tech Fund, Alliance Bond Fund U.S. Government, Class A, a unit investment trust, and New York Housing Corp. Municipal Bonds. As a result of the transfer, customer JM's H.J. Meyers account increased from $60,146.34 to $128,606.34 in total assets as of June 28, 1996, consisting of $34,945.20 in municipal bonds, $36,513.39 in mutual funds, $45,040 in common stocks and options, and $9,243.40 in a unit investment trust. The funds and bonds transferred from customer JM's McLaughlin account were all sold in July 1996. From June 28, 1996 to July 26, 1996, the net value of customer JM's H.J. Meyers account declined from $128,606.34 to $106,239.62. On July 26, 1996, customer JM's H.J. Meyers account consisted of $30,471.35 in municipal bonds, $6,796.84 in mutual funds, $62,085.00 in common stocks and options, and $6,886.43 in cash. The decline in the value of the account was primarily the result of the use of the proceeds from the sale of the mutual funds to purchase additional common stocks, that declined in value by the end of the months in which they were purchased.[7] In August 1996, the common stock positions were liquidated at customer JM's request.[8] Taking into account the value of customer JM's McLaughlin holdings that were transferred to H.J. Meyers, customer JM ultimately suffered a loss of approximately $35,000, which included commissions and other fees of approximately $25,000.

The evidence presented during the hearing below also indicates that H.J. Meyers was a market maker for each of the securities that Howard recommended to customer JM. In addition, the evidence indicates that the relevant securities were all speculative. For instance, H.J. Meyers'

---

[7]    The following transactions in customer JM's account are illustrative: purchase of 3,500 shares of American Materials on July 5, 1996 at $7.705 per share, which were valued at $5 per share on July 26, 1996; purchase of 1,100 shares of Palomar on July 22, 1996 at $12.015 per share, which were valued at $9.50 per share on July 26, 1996; and purchase of 2,000 shares of Nashville Country at $5.754 per share on July 16, 1996; which were valued at $5 per share on July 26, 1996.

[8]    An NASD Regulation special investigator testified that when the securities were sold on an unsolicited basis, they were sold at higher prices than they would have been had they been sold later on, except for Excel Tech.

- 5 -

compliance department considered each of the recommended securities to be a speculative investment. Howard, moreover, admitted during his investigative testimony that many of the securities were speculative in nature.

Enforcement also presented evidence regarding the holding periods for the securities in customer JM's H.J. Meyers account, the annual turnover ratio, and the cost-to-equity ratio. The average holding period for the securities in the account was 40 days. Using a modified Looper analysis, the account was turned over approximately 8.5 times on an annual basis. In addition, the annualized cost-to-equity ratio was 54 percent.

Inaccurate Form U-4s. In July 1997, Howard left H.J. Meyers and started working at The Boston Group. On July 25, 1997, NASD Regulation staff sent Howard a "Wells" letter,[9] advising him that the staff was considering recommending formal disciplinary action against him based on violations of Conduct Rules 2110 and 2310 in connection with his unsuitable recommendations to customer JM. NASD Regulation staff received a signed receipt indicating that the letter was delivered on July 26, 1997, during the period when Howard was changing employment from H.J. Meyers to The Boston Group.[10]

On July 24, 1998, there was a mass transfer of registrations from The Boston Group to the National Securities Corporation.[11] Howard did not update his Form U-4 at that time to indicate that he was the subject of a pending investigation. In explanation of his failure to update the Form U-4, Howard stated that he "woke up one morning" and the office had changed from The Boston Group to the National Securities Corporation.

On October 15, 1998, NASD Regulation staff sent Howard a letter advising him to update his Form U-4 to reflect a "yes" answer to Question 22I(1), which asks, "Have you been notified

---

[9]    A "Wells" letter refers to a letter sent by NASD Regulation staff notifying a respondent "that a recommendation of formal disciplinary charges is being considered" and usually provides the respondent with an opportunity to "submit a written statement explaining why such charges should not be brought." NASD Notice to Members ("NTM") 97-55 (Aug. 1997). See also Procedures Relating to the Commencement of Enforcement Proceedings and Termination of Staff Investigations, Rel. No. 33-5310 (Sept. 27, 1972) (discussing recommendations of the Advisory Committee on Enforcement Policies, which came to be known as the "Wells Committee," including the suggestion that persons be given the opportunity to present a statement to the Securities and Exchange Commission ("SEC") regarding an investigation pre-complaint).

[10]    After H.J. Meyers' Boston office closed in June 1997, Howard signed a Form U-4 relating to his employment with The Boston Group on July 29, 1997. Howard failed to respond to Question 22I, which asked: "Are you now the subject of any complaint, investigation, or proceeding that could result in a "yes" answer to parts A-H of this item?" On August 22, 1997, Howard amended the Form U-4 to reflect a "no" answer to the Question 22I(1).

[11]    The Boston Group filed a Form U-5 reporting Howard's departure on July 24, 1998. The Form U-5 failed to disclose the pending NASD Regulation investigation. Enforcement did not allege in the complaint that the July 24, 1998 Form U-5 was inaccurate.

- 6 -

in writing that you are now the subject of any investigation, regulatory complaint, or proceeding that could result in a 'yes' answer to any part of 22A, B, D, E, or F?" Howard acknowledged that he received the letter. Howard did not, however, update the Form U-4 to reflect the NASD Regulation investigation.[12]

In October 1998, Howard became associated with Moors & Cabot. On November 2, 1998, Moors & Cabot filed a Form U-4, on behalf of Howard, that inaccurately showed a "no" answer to Question 22I(1). Howard denied that he was responsible for the inaccurate information. Howard opined that, because he was not sure of the answer to Question 22I(1), he probably left the question blank and signed and returned the form to the Moors & Cabot registration clerk, Carole Fiore ("Fiore"). Howard claimed that the check marks that were responsive to Question 22I(1) were not made by him.

Fiore testified that a newly hired Moors & Cabot registered representative, like Howard, would complete his Form U-4 by hand. Fiore would then review the Form U-4 to ensure that it was complete. Fiore also testified that, if there was a problem with how the form was filled out, she would bring it to the representative's attention immediately. After she received the completed and signed Form U-4, she would deliver it to the branch manager for his signature. After the branch manager had signed the Form U-4, she filed it with the NASD. Fiore remembered speaking to Howard on several occasions concerning his employment documents. She did not remember whether she specifically discussed the Form U-4 with Howard, however.

Fiore acknowledged that she could have made the check mark answering "no" to Question 22I(1) on the November 2, 1998 Form U-4. Nonetheless, she stated that she would only have done so after noting that the question was left blank and after having spoken to Howard concerning the correct answer. Fiore stated emphatically that she would not have made a change on the Form U-4, including on Question 22I(1), without the representative's approval.[13] She also stated that she did not specifically remember checking the "no" answer to Question 22I(1) on Howard's Form U-4.

Hearing Panel Decision. On December 1, 1999, the Hearing Panel issued its decision. The Hearing Panel found that Howard had violated Conduct Rules 2110 and 2310 by making unsuitable recommendations to customer JM, and had violated Conduct Rule 2110 by being responsible for the inaccurate Form U-4 filed with the NASD on November 2, 1998.[14]

---

[12]    The National Securities Corporation filed a Form U-5 reporting Howard's departure on October 26, 1998. The Form U-5 failed to disclose the pending NASD Regulation investigation. Enforcement did not allege in the complaint that the October 26, 1998 Form U-5 was inaccurate.

[13]    Fiore had been employed by Moors & Cabot for more than 21 years and she had been completing Form U-4s for more than 30 years. She stated that she had never before been accused of changing a Form U-4.

[14]    The Hearing Panel determined that Howard's failure to update the Form U-4 after July 24, 1998 was a technical violation. The Hearing Panel determined that Howard should not

NASDR 003230

- 7 -

The Hearing Panel fined Howard $17,500 and suspended him for 90 calendar days for the unsuitable recommendations, and fined him $7,500 and suspended him for an additional 90 calendar days for the filing of an inaccurate Form U-4, for a total fine of $25,000 and a total suspension of 180 calendar days. The Hearing Panel also directed Howard to pay $3,484.25 in hearing costs. This appeal followed.

Discussion

The complaint alleged that Howard had made unsuitable recommendations and filed inaccurate Form U-4s. Each cause of action will be discussed separately below.

Unsuitable Recommendations. The first cause of action alleged that Howard made unsuitable recommendations to customer JM in violation of Conduct Rules 2110 and 2310. Rule 2110 requires observation of "high standards of commercial honor and just and equitable principles of trade," and Rule 2310 requires associated persons to have reasonable grounds for believing that a recommendation is suitable for a customer based on his or her financial situation and needs.[15]

The suitability rule can be violated in a number of ways. Most often, the rule is violated based on the quality of the recommended transactions when compared to the customer's financial situation and needs. See In re Rafael Pinchas, Exchange Act Rel. No. 41816, at 10-12 (Sept. 1, 1999). The rule also can be violated if a representative's recommendations are quantitatively unsuitable. As the SEC has recognized, "[d]epending on a particular customer's situation and account objectives, the extent of trading alone may render transactions unsuitable. Hence, excessive trading represents an unsuitable frequency of trading and violates NASD suitability standards." In re Paul C. Kettler, 51 S.E.C. 30, 32 (1992); see also In re Harry Gliksman, Exchange Act Rel. No. 42255, at 4 (Dec. 20, 1999), appeal filed, 00-70258 (9th Cir. Feb. 22, 2000); In re Michael H. Hume, 52 S.E.C. 243, 245 n.5 (1995).[16] In either case, a representative may make only such recommendations -- or effect such transactions in cases where the representative controls the account -- as would be consistent with the customer's financial situation and needs. See Rafael Pinchas, supra, at 10; In re Larry Ira Klein, 52 S.E.C. 1030, 1040 (1996). Even where a customer affirmatively seeks to engage in highly speculative or otherwise

---

be sanctioned for that violation because the transfer was part of a wholesale transfer that Howard did not control and was not aware of prior to its completion.

[15]    We note that NASD rules that are applicable to member firms are applicable to individuals through Rule 115.

[16]    The NASD Board of Governors' policy statement with respect to fair dealing with customers, which appears in the NASD Manual following the suitability rule, provides in pertinent part as follows: "Some practices that have resulted in disciplinary action and that clearly violate this responsibility for fair dealing are . . . [e]xcessive activity in a customer's account. . . ." IM-2310-2.

- 8 -

aggressive trading, a representative is under a duty to refrain from making recommendations that are incompatible with the customer's financial profile. See In re John M. Reynolds, 50 S.E.C. 805, 808-09 (1992) (regardless of whether the customers wanted to engage in aggressive and speculative trading, the representative was obligated to abstain from making recommendations that were inconsistent with their financial situation); In re Gordon Scott Venters, 51 S.E.C. 292, 294-95 (1993) (same). With these general principles in mind, we turn to the pertinent facts in this case.

Customer JM was 85 years old when he opened his account at H.J. Meyers. At that time, he had assets of approximately $150,000 and annual income of approximately $15,000. The H.J. Meyers new account card indicated that customer JM's objectives were "growth" and "growth and income." The new account card did not indicate that his objectives included speculation, although that was a possible investment objective that could have been checked on the form. Yet, Howard recommended numerous transactions in speculative securities. For instance, for the year ending December 31, 1995, Excel Tech, which customer JM initially purchased on May 7, 1996, had a net loss of $1.59 million or $.21 per share. In H.J. Meyers' January 31, 1996 research newsletter, Adaptive Solutions, Inc., which customer JM purchased on February 12 and 16, 1996, was described as a speculative buy. In H.J. Meyers' April 30, 1996 research newsletter, Magna Lab Class A, Inc., which customer JM purchased on June 17 and June 27, 1996, was described as a speculative buy. Additionally, American Materials' Form SB-2 SEC registration statement, dated September 10, 1996, characterized its securities -- which Howard recommended and customer JM purchased -- as involving a high degree of risk and warned that the company had a limited operating history, recent operating losses, a working capital deficiency and had lost a significant amount of business. Indeed, Howard admitted that many of the securities that he recommended to customer JM were speculative.[17] In light of customer JM's financial situation and needs, Howard's recommendations of speculative securities were unsuitable.

Howard's recommendations also led to an undue concentration of these speculative securities, making the recommendations particularly unsuitable. In fact, for seven months out of a 10-month period, approximately 90 percent of customer JM's holdings in his H.J. Meyers account included speculative securities. During the hearing below, Howard admitted that customer JM's account was "over-concentrated." We find that the concentration of these speculative securities in customer JM's account, under the facts of this case, was unsuitable. See In re Clinton Hugh Holland, Jr., 52 S.E.C. 562, 566 (1995) ("The concentration of high risk and speculative securities in Bradley's account, which were predominately underwritten by Paulson, was not suitable."), aff'd, 105 F.3d 665 (9th Cir. 1997) (table format).

We further find that Howard's recommendations were quantitatively unsuitable. As an initial matter, there is no dispute that Howard recommended all of the transactions in question and that customer JM routinely followed Howard's investment advice. The trading activity Howard recommended was also clearly excessive. Although there is no single test for making an

---

[17]    In his investigative testimony, for instance, Howard stated that customer JM wanted to invest in speculative securities, that many of the stocks that were sold at H.J. Meyers were speculative, and that the stocks held in customer JM's H.J. Meyers account were a mixture of both speculative and growth stocks.

excessive trading determination, factors such as the turnover ratio,[18] the cost-equity ratio,[19] the use of "in and out" trading,[20] and the number and frequency of trades in an account introduce some measure of objectivity or certainty into the analysis and provide a basis for a finding of excessive trading. See Costello v. Oppenheimer & Co., 711 F.2d 1361, 1369 (7th Cir. 1983); Hecht v. Harris, Upham & Co., 283 F. Supp. 417, 435-36 (N.D. Cal. 1968), modified on other grounds, 430 F.2d 1202 (9th Cir. 1970); In re John M. Reynolds, 50 S.E.C. 805, 808 n.12 (1992).

Turnover rates between three and four, for instance, have triggered liability for excessive trading,[21] and the courts and the SEC have held that there is little question about the excessiveness of trading when an annual turnover rate in an account is greater than six.[22]

---

[18]     The turnover ratio is calculated by applying the "Looper formula," named after In re Looper & Co., 38 S.E.C. 294 (1958), which divides the total cost of purchases made during a given period by the average monthly investment. See In re Frederick C. Heller, 51 S.E.C. 275, 276-77 (1993). The turnover ratio is computed "by dividing the aggregate amount of the purchases by the average cumulative monthly investment, the latter representing the cumulative total of the net investment in the account at the end of each month, exclusive of loans, divided by the number of months under consideration." Id. at 279 n.10. A modified Looper formula divides the total cost of purchases by the average monthly equity. See In re Allen George Dartt, 48 S.E.C. 693, 695 (1987); Report of the Special Study of the Options Markets to the Securities and Exchange Commission, H.R. Com. Print IFC3, 96th Cong., 1st Sess. (1978).

[19]     This is sometimes expressed as the "break-even cost factor." The phrases refer to identical calculations. See In re Donald A. Roche, Exchange Act Rel. No. 38742 (June 17, 1997). This calculation represents the percentage of return on the customer's average net equity needed to pay broker/dealer commissions and other expenses, such as margin interest. Put another way, because of the transaction costs related to trading, the account would need to appreciate that amount to break even. See Frederick C. Heller, supra, at 276-77.

[20]     The term "in and out" trading refers to the sale of all or part of a portfolio, with the money from the sale being reinvested in other securities, followed by the sale of the newly acquired securities. See Costello v. Oppenheimer & Co., 711 F.2d 1361, 1369 n.9 (7th Cir. 1983).

[21]     In re Donald A. Roche, Exchange Act Rel. No. 38742 (June 17, 1997) (turnover rates of 3.3, 4.6 and 7.2 provided strong support for finding of churning); In re Gerald E. Donnelly, 52 S.E.C. 600, 602 n.11 (1996) (noting that respondent had acknowledged that "an annualized turnover rate of between two and four percent is presumptive of churning."); Michael H. Hume, supra, at 245 n.5 (noting that turnover rates of 3.5 and 4.4 were found to be excessive in past cases); John M. Reynolds, supra, at 808 n.12 (1992) (finding excessive trading, in part, based on the fact that the account was turned over more than four times on an annualized basis); In re R.H. Johnson & Co., 36 S.E.C. 467, 469-80 (1955) (turnovers of 3.26 to 11.1 annually found to be excessive), aff'd, 231 F.2d 523 (D.C. Cir. 1956).

[22]     See, e.g., In re Peter C. Bucchieri, 52 S.E.C. 800, 805 (1996) ("While there is no clear line of demarcation, courts and commentators have suggested that an annual turnover rate of six reflects excessive trading.") (citing Mihara v. Dean Witter & Co., 619 F.2d 814, 821 (9th

NASDR 003233

- 10 -

Excessive trading has also been found in cases in which the cost-equity ratio was between 15 and 30 percent, or more.[23] With regard to evidence of "in and out" trading, the Seventh Circuit Court of Appeals has remarked that, "it is a practice extremely difficult for a broker to justify." Costello, 711 F.2d at 1369 n.9.

Here, Howard recommended 30 purchases and 18 sales of eight different securities over the 10-month period from October 1995 to August 1996.[24] The average holding period for the securities in customer JM's account was 40 days. Using a modified Looper analysis, the account was turned over approximately 8.5 times on an annual basis. The annualized cost-to-equity ratio was 54 percent, meaning that the minimum rate of return necessary to cover annual account costs was 54 percent. In addition, there was a pattern of "in and out" trading in the account. There were, for instance, repeated purchases and then sales of Palomar, Community Medical, Magna Lab Class A, Inc., Nashville Country, and Excel Tech after relatively short holding periods.[25] Howard's explanation for the frequency of the trades was that H.J. Meyers emphasized "quick turnover" in the accounts. We find, however, that the trading activity in customer JM's account was quantitatively unsuitable based on customer JM's financial background and needs.

---

Cir. 1980)); In re Shearson Lehman Hutton Inc., 49 S.E.C. 1119, 1122 (1989) (same).

[23]     See, e.g., Peter C. Bucchieri, supra, at 2-7 (finding that cost-equity ratio for accounts of 22.4 percent, 25.6 percent, 21.8 percent, and 24.9 percent supported finding of excessive trading); In re Thomas F. Bandyk, Exchange Act Rel. No. 35415 (Feb. 24, 1995) ("His excessive trading yielded an annualized commission to equity ratio ranging between 12.1% and 18.0%."); Frederick C. Heller, supra, at 277 (cost-equity ratio of 36 percent evidenced excessive trading); In re Michael David Sweeney, 50 S.E.C. 761, 763-65 (1991) (cost-equity ratios of 27 percent, 44 percent, 36 percent, and 22 percent indicated excessive trading).

[24]     These securities are as follows: Palomar; Adaptive Solutions, Inc., Community Medical, Magna Lab Class A, Inc., Nashville Country, Excel Tech, American Materials, and Dynagen, Inc.

[25]     Customer JM purchased 300 shares of Community Medical on December 14, 1995, and sold the shares on February 12, 1996. Customer JM purchased 400 shares of Adaptive Solutions, Inc. on February 12, 1996 and an additional 4,500 shares on February 16, 1996, which he sold on March 7 and 14, 1996.

Customer JM purchased 1,000 shares of Magna Lab Class A, Inc. on March 5, 1996 and an additional 1,000 shares on March 14, 1996, all of which he sold on March 27, 1996. He then purchased 1,700 shares of Magna Lab Class A, Inc. on June 17, 1996 and an additional 3,300 shares on June 27, 1996, 2,500 of which he sold on July 22, 1996.

Customer JM purchased 1,000 shares of Excel Tech on May 7, 1996, which he sold on May 10, 1996. On May 28, and 31, 1996, he purchased an additional 1,000 and 2,000 shares of Excel Tech, respectively, 1,500 shares of which he sold on June 27, 1996. He purchased 2,000 shares of Nashville Country on May 3, 1996, which he sold on May 15, 1996. On July 16, 1996, he purchased an additional 2,000 shares of Nashville Country.

- 11 -

As discussed above, Howard does not dispute the core facts evidencing his violative conduct. In fact, he admits that he "stepped over the line" with regard to the trading in the account. Howard attempts to explain his conduct by describing the chaotic, high-pressure sales atmosphere in which he worked while at H.J. Meyers. The following testimony given by Howard during the hearing below is illustrative:

> The point is when you have a [sic] atmosphere with everyone screaming and yelling on the phone, you can hardly hear each other think [sic]. It's not like a normal board room. The noise level was kept up to a fever [sic] pitch. There were meetings five or six times a day. What have you done so far? How many shares do you have in [sic]? Can you get more shares in this account? What is your commitment that you can do tomorrow, and I want it in writing. And you have an atmosphere like that, okay, you tend to go, maybe cross over the line. And you tend to maybe make recommendations that maybe in hindsight, even though you're tempted to blame other people and you're tempted to say, well, the client agreed to it or the client authorized it, in the full context that doesn't justify it.

At another point, Howard stated that walking into H.J. Meyers was like "walking into a carnival" with "30 and 40 brokers screaming at their clients." Howard's characterization of the work environment at H.J. Meyers, however, provides no justification for his misconduct. Howard's primary focus should have been on his customer's best interests. If he was incapable of rising above the atmosphere of the firm, he should have left. The answer certainly was not to recommend unsuitable transactions.

In sum, Howard was obligated to tailor his recommendations to customer JM's financial profile and investment objectives. Howard's recommendations to customer JM did not meet his obligation to make customer-specific determinations of suitability both in terms of the types of securities recommended and the number of transactions recommended. Howard's recommendations to customer JM were clearly unsuitable and violated Conduct Rules 2110 and 2310.

Inaccurate Form U-4s. The second cause of action alleged that Howard filed inaccurate Form U-4s. Specifically, the second cause alleged as follows: (i) while employed by National Securities Corporation between July 1998 and October 1998, Howard failed to update his Form U-4 to include information concerning NASD Regulation's investigation of customer JM's complaint; (ii) in response to Question 22I(1) on the Form U-4 filed on November 2, 1998, Howard falsely checked "no"; and (iii) Howard continued to fail to amend the Form U-4 filed with Moors & Cabot to reflect a "yes" answer to Question 22I(1), which asks whether the signatory has been notified in writing that he or she is the subject of any investigation, regulatory complaint, or proceeding.

According to the record, NASD Regulation staff sent Howard a July 25, 1997 "Wells" letter[26] advising him that the staff was considering recommending that formal disciplinary action be taken against him in connection with his unsuitable recommendations to customer JM. NASD Regulation staff received a signed receipt indicating the letter was delivered to Howard on July 26, 1997, during the period when he was changing employment from H.J. Meyers to The Boston Group.

Subsequent to the Wells letter, in NTM 98-27 (March 1998), the NASD amended the Form U-4, effective March 16, 1998, to define the term "investigation" in Question 22I(1) to include "NASD Regulation Inc. investigations after a Wells notice has been given or after an associated person has been advised by the staff that it intends to recommend formal disciplinary action." NTM 98-27 stated that anyone who had previously been given a "Wells" notice by NASD Regulation staff relating to a pending investigation was obligated to check "yes" to Question 22I(1) the next time any amendment to the Form U-4 was filed or upon the filing of a new Form U-4 to effect a transfer.[27]

On July 24, 1998, there was a mass transfer of registrations from The Boston Group to the National Securities Corporation.[28] In connection with the transfer, Howard failed to update his Form U-4 to indicate that he was subject to a pending investigation based on Howard's receipt of the 1997 Wells letter. Howard's explanation for his failure to update the inaccurate Form U-4 was that he had awoken one morning to discover for the first time that the office had changed from The Boston Group to the National Securities Corporation. Although the Hearing Panel found that Howard's failure to update the Form U-4 after July 24, 1998 was a violation, the Hearing Panel did not separately sanction him for this violation because the transfer was part of a wholesale transfer that Howard did not control and was not aware of prior to its completion.

On October 15, 1998, however, NASD Regulation staff sent Howard a letter that, among other things, advised him to update his Form U-4 to reflect a "yes" answer to Question 22I(1). Howard admits that he received this letter. In addition, Howard became associated with Moors & Cabot in October 1998. On November 2, 1998, Moors & Cabot, on behalf of Howard, filed a Form U-4 that inaccurately showed a "no" answer to Question 22I(1). Howard denied that he was responsible for the inaccurate information. Howard opined that, because he was not sure of the answer to Question 22I(1), he probably left the question blank and signed and returned the

---

[26]    See supra note 9 and accompanying text.

[27]    Pursuant to the March 1998 NTM, Howard's required answer to Question 22I(1) on The Boston Group Form U-4 changed from a "no" answer to a "yes" answer. Howard, however, was not required to file an immediate amendment to update The Boston Group Form U-4 because the need to update Question 22I(1) resulted not from a change in Howard's circumstances, but from an expansion of the scope of the term investigation in Question 22I(1).

[28]    The Boston Group filed a Form U-5 reporting Howard's termination on July 24, 1998. The Form U-5 failed to disclose the pending NASD Regulation investigation. Enforcement did not allege in the complaint that the July 24, 1998 Form U-5 was inaccurate.

NASDR 003236

- 13 -

form to the Moors & Cabot registration clerk, Fiore. Howard also claimed that the check marks made by Question 22I(1) were not made by him.

Fiore acknowledged that she could have made the check mark answering "no" to Question 22I(1) on the November 2, 1998 Form U-4. She stated emphatically, however, that she would not have completed the answer to Question 22I(1) or made a change to it without the broker's approval. She also stated that she did not specifically remember checking the "no" answer to Question 22I(1) on Respondent's Form U-4.

We agree with the Hearing Panel that Howard violated Conduct Rule 2110 because he either provided inaccurate information on the November 2, 1998 Form U-4 or allowed Moors & Cabot to file a form containing inaccurate information. That is, by permitting Moors & Cabot to file the Form U-4 on his behalf, Howard caused an inaccurate Form U-4 to be filed. Even if Howard did not physically check the "no" answer, he is responsible for the inaccurate information because (i) he should have checked "yes" to the Question 22I(1), based on the October 15, 1998 letter that he received from NASD Regulation; (ii) he admitted he did not check the "yes" answer to Question 22I(1); and (iii) he knew the Form U-4 would be filed. It is axiomatic that the person who provides information for a regulatory filing and executes that filing is responsible for ensuring that the information contained therein is accurate. See In re Robert E. Kauffman, 51 S.E.C. 838, 840 (1993) ("Every person submitting registration documents has the obligation to ensure that the information printed therein is true and accurate."), aff'd sub nom, Kauffman v. SEC, 40 F.3d 1240 (3d Cir. 1994).

We also concur with the Hearing Panel's finding that Howard subsequently violated Conduct Rule 2110 by failing to file an amendment to the November 2, 1998 Form U-4 to correct the error. The burden of updating a Form U-4 rests with the registered representative. See In re Frank R. Rubba, Exchange Act Rel. No. 40238, at 5 (Jul. 21, 1998) ("[T]he responsibility for maintaining the accuracy of the Form U-4, by updating the information in the filing, as necessary, lies with the registered representative.").

Procedural Arguments. Howard raises numerous arguments about perceived procedural improprieties. We will address each in turn.

First, Howard claims that Enforcement somehow denied him access to an attorney. As an initial matter, the SEC has repeatedly held that "there is no constitutional or statutory right to the assistance of counsel in NASD proceedings." In re Barry C. Wilson, 52 S.E.C. 1070, 1075 (1996) (citing In re Phyllis J. Elliott, 51 S.E.C. 991, 996 n.17 (1994); In re Richard R. Perkins, 51 S.E.C. 380, 386 (1993)). In addition, there is no evidence in the record to support Howard's allegation that Enforcement denied him access to an attorney. The Hearing Panel, moreover, postponed at least one of the pre-hearing conferences so that Howard could secure counsel. We thus reject Howard's claim.

Second, Howard argues that we should take into account an alleged investigation of NASD District 11 by the SEC. We disagree. As Enforcement points out in its brief on appeal, the documents Howard submitted in support of his claim merely evidence his complaint to the SEC about District 11. There is no evidence that the SEC is actually conducting any investigation of District 11. Even assuming, arguendo, that such an investigation were being

NASDR 003237

- 14 -

conducted, we fail to see how it would be relevant to our review, and Howard has not elaborated on this point.

Third, Howard claims that his civil rights were violated because a person representing Enforcement "uttered a religious and racist epithet directed at [Howard] during the Hearing." He also asserts that he was denied access to the hearing transcript, which he argued would validate his claim. Enforcement vehemently denies that any religious or racist epithets were directed toward Howard (or anyone else) during the hearing and disputes Howard's claim that he was denied access to the hearing transcript. We note that Howard was told on multiple occasions that he could either purchase a copy of the transcript from the court reporting service or review the transcript at Enforcement's offices in Boston, where Howard lived. Howard failed to take advantage of either opportunity. Nonetheless, the National Adjudicatory Council subcommittee that presided over the appeal proceeding took the unusual step of providing Howard with a copy of the hearing transcript free of charge because of the gravity of Howard's allegation. Howard, however, did not provide any citation to the hearing transcript indicating that improper statements were made. Our review of the hearing transcript, moreover, failed to uncover any improper statements, let alone religious or racist epithets, directed toward Howard by Enforcement or the Hearing Panel. We, therefore, reject Howard's unsubstantiated assertion.

Fourth, Howard intimates that Enforcement engaged in selective prosecution of him. In order to establish a claim based on selective prosecution, the proponent must show "that he was singled out for enforcement action while others who were similarly situated were not and that his prosecution was motivated by arbitrary or unjust considerations, such as race, religion, or the desire to prevent the exercise of a constitutionally-protected right." In re Barry C. Wilson, 52 S.E.C. 1070, 1074 (1996). Howard has failed to prove any of the elements of such a claim.

Fifth, Howard asserts that the Hearing Panel's decision is "null and void" because, according to Howard, the Enforcement attorney who prosecuted this case is not a licensed attorney. The Enforcement attorney in question, however, stated that he is a licensed attorney in good standing, and Howard has presented no evidence to the contrary. In addition, whether the Enforcement attorney in question is a member of the bar has no bearing on Enforcement's ability to bring this action against Howard. Accordingly, we reject Howard's argument.

Sixth, Howard argues that the case against him should be dismissed based on a conflict-of-interest theory because District 11 hired James Nestor ("Nestor"), who had been a compliance officer at H.J. Meyers. We reject this argument. The NASD Office of Disciplinary Affairs in Washington, D.C., after a thorough and independent review of the investigative file, authorized the complaint against Howard. Enforcement is the complainant, moreover, not District 11. The attorney representing Enforcement in these proceedings also indicated that he was not in any way acquainted with Nestor and did not receive any information or assistance from him. Howard has not shown that the alleged conflict in any way caused him to be prejudiced or otherwise requires dismissal of this action. As a result, his claim must fail.

Seventh, Howard argues that the NASD's Code of Procedure required the Hearing Panel to issue the decision within 60 days of the hearing and that because the decision in this case was not issued within that time frame it is "null and void." We disagree. Procedural Rule 9268 provides in pertinent part as follows:

NASDR 003238

- 15 -

> Within 60 days after the final date allowed for filing proposed
> findings of fact, conclusions of law, and post-hearing briefs, or by
> a date established at the discretion of the Chief Hearing Officer, the
> Hearing Officer shall prepare a written decision that reflects the
> views of the Hearing Panel . . . as determined by majority vote.

The rule addresses the timing of the Hearing Officer's preparation of the decision (which can then
be distributed for final approval by the other members of the Hearing Panel) and not the issuance
of the decision. In addition, the triggering event is not the hearing date, but rather "the final date
allowed for filing proposed findings of fact, conclusions of law, and post-hearing briefs, or by a
date established at the discretion of the Chief Hearing Officer." Finally, Rule 9268(d) states
simply that the Office of Hearing Officers shall "promptly serve the decision" thereafter.

Eighth, Howard asserts that he was denied the opportunity to provide oral argument
during this appeal. The record, however, clearly indicates that Howard was notified on several
occasions of the date, time and place of the oral argument, and that Howard failed to appear.

Sanctions

The Hearing Panel below imposed the following sanctions on Howard: $17,500 fine and
a 90-day suspension for the unsuitable recommendations and $7,500 fine and an additional 90-
day suspension for the inaccurate Form U-4, for a total fine of $25,000 and a total suspension of
180 calendar days. Howard also was assessed $3,484.25 in costs, consisting of a $750
administrative fee and a $2,734.25 transcript fee. We will discuss sanctions as to each cause of
action separately.

Unsuitable Recommendations. The NASD Sanction Guidelines ("Sanction Guidelines")
for a suitability violation recommend imposing a fine of $2,500 to $50,000. See NASD Sanction
Guidelines (1998 ed.) at 83. In addition, in cases involving clearly unsuitable securities and no
prior similar misconduct, the Sanction Guidelines recommend that the adjudicator consider a
suspension of 10 to 30 business days. In egregious cases, the Sanction Guidelines recommend
that a longer suspension of up to two years or a bar should be considered.

We find that Howard's conduct was egregious. Over a 10-month period, Howard
recommended myriad transactions in speculative securities to customer JM that clearly were not
suitable for him. Customer JM, moreover, suffered a loss of approximately $35,000 from this
trading, nearly $25,000 of which resulted from commissions and other fees.

We note that the Hearing Panel below found that Howard had attempted to intimidate
customer JM. In particular, the Hearing Panel stated that Howard's filing of various complaints
and lawsuits against customer JM and his stepson represented both a failure by Howard to
acknowledge his own misconduct and an attempt to intimidate his customer.[29] We specifically
do not rely on this information in determining appropriate sanctions in this case.

---

[29]    Howard recorded numerous complaints with various law enforcement agencies
and filed lawsuits in three different courts against customer JM and/or his stepson. One court

NASDR 003239

- 16 -

Based on the egregious nature of his misconduct, we order that Howard be suspended for two years in all capacities and fined $17,500 for making unsuitable recommendations to customer JM.

Inaccurate Form U-4s. The Sanction Guidelines recommend a fine of between $2,500 and $50,000, and the consideration of a suspension for 5 to 30 business days for filing false, misleading, or inaccurate forms or amendments. See NASD Sanction Guidelines (1998 ed.) at 65. In egregious cases, the Sanction Guidelines suggest a longer suspension in any or all capacities (of up to two years) or a bar.

Howard argued that he was uncertain whether the NASD Regulation investigation was ongoing during the relevant period. We find his position untenable in light of the October 15, 1998 letter sent by NASD Regulation staff directing Howard to update his Form U-4, a letter that Howard received immediately prior to his employment at Moors & Cabot. Howard refused to take responsibility for the filing of the inaccurate Form U-4 on November 2, 1998. Howard chose instead to blame others. For instance, in a February 1, 1999 letter to the Criminal Investigations Unit of the Internal Revenue Service, Howard claimed that the Moors & Cabot registration clerk, Fiore, forged the Form U-4. Howard repeated this allegation both in his March 29, 1999 motion in opposition to Enforcement's motion for summary judgment and during the hearing. Howard never explained why he did not subsequently correct the inaccurate November 2, 1998 Form U-4. Howard's conduct was egregious, as he intentionally either filed or caused to be filed an inaccurate Form U-4.

We order that Howard be suspended in all capacities for 90 calendar days and fined $7,500 for his failure to update his Form U-4 and for filing an inaccurate Form U-4. The 90-calendar-day suspension shall run concurrently with the two-year suspension for the suitability violation.

Conclusion

Based on the foregoing discussion, we order that Howard be fined $17,500 and suspended for two years in all capacities for making unsuitable recommendations and fined $7,500 and suspended for 90 calendar days in all capacities for the inaccurate Form U-4s (the suspensions to run concurrently). Accordingly, Howard is fined a total of $25,000 and suspended in all

---

reviewing a lower court's dismissal of Howard's case noted in its decision that the circumstances surrounding the case, including Howard's complaints to law enforcement agencies and the lawsuits he filed in other courts, "bring this court to the conclusion that [Howard] herein had no basis for bringing the instant action against [customer JM] other than to harass him, which in view of [customer JM's] age (88) is no small matter." The Hearing Panel below viewed Howard's continuous legal actions directed at customer JM and his stepson as both a failure by Howard to acknowledge his own misconduct and an attempt to intimidate his customer.

NASDR 003240

- 17 -

capacities for a total of two years.  We also uphold the Hearing Panel's imposition of $3,484.25 in costs.[30]

On Behalf of the National Adjudicatory Council,

Joan C. Conley
Senior Vice President and Corporate Secretary

\\Kst_srv_fps2\data\Depts\OGC\NASDR Appellate Group\Wronal/Howard\Howard Decision2.doc

---

[30]    The NAC has considered all of the arguments of the parties.  They are rejected or sustained to the extent that they are inconsistent or in accord with the views expressed herein.  Pursuant to NASD Procedural Rule 8320, any member who fails to pay a fine, costs, or other monetary sanction imposed in this decision, after seven days' notice in writing, will summarily be suspended or expelled from membership for non-payment.  Similarly, the registration of any person associated with a member who fails to pay any fine, costs, or other monetary sanction, after seven days' notice in writing, will summarily be revoked for non-payment.

# Appeal to the SEC

Received: 12/15/ 0 14:28;     6176219774 -> 202 728 8894;  Page 1

12/15/2000  14:43

NASDR 003241

## === COVER PAGE ===

TO:       JOAN CONLEY

    FAX: 12027288894

FROM:     DAN HOWARD

    FAX: 6176219774

    TEL: 6176219774


COMMENT:  CONFIDENTIAL

**NASDR 003242**

- **NOTICE OF APPEAL TO SECURITIES AND EXCHANGE COMMISSION FROM THE DECSION OF THE NATIONAL ADJUDICATARY COUNCIL REGARDING COMPLAINT No. C11970032; DANIEL R. HOWARD.   REQUEST FOR STAY**

1. Dan Howard ("Howard"), Pro-Se, hereby appeals the "decision" of the National Adjudicatory Council on the following grounds:

   The "decision" is null and void and has no force or effect due to rendering of **original** "decision" beyond 60-day deadline as stated in NASD Rule 9268. Also, the additional Hearing Members did not sign the "decision". Finally, the Hearing Officer failed to "promptly serve the decision." In Talmo v. Civil Service Commission (1991) 231 Cal.App.3d 210,282 Cal.Rptr.240, the Court said:
       "It is well settled an administrative agency is bound by its own rules and regulations (Bonn v. California State University, Chico (1979) 88 Cal.App.3d 985,990,152 Cal.Rptr. 267.)"

   NASD attorney John D'Amico ("D'Amico"), according to an investigation of the Boston Bar Association, is not licensed to practice law in Massachusetts. Therefore his on the record Notice of Appearance at the Hearing was a felony. D'Amico failed to inform his superiors that he is an unlicensed attorney. Howard hereby motions the SEC to contact D'Amico directly so he can confirm his status in Massachusetts as a non-attorney. He will be happy to comply. Due to this revelation, the Hearing Panel decision is null and void and has no force or effect.

   D'Amico directed an on the record religious and racial slur at Howard during the hearing. Despite Howard's strenuous objections, the Hearing continued. Howard hereby motions the SEC examine the entire record, page by page, due to possible violations of various State and Federal hate crime statutes. Therefore, causing the SEC to be legally liable for the actions of D'Amico. Due to violations of the 1964 Civil Rights Act, the Hearing Panel Decision is Null and Void and has no force or effect.

   D'Amico and the NASD authorized Howard's appointment as a Branch Manager for Brookstreet Securities.

   NASD employee Jim Nestor, a former H.J. Meyers Compliance Officer in Boston, approved all trades in writing. D'amico hired Jim Nestor and then refused to prosecute him because...."he works for the NASD..."Therefore this conflict of interest renders the decision null and void.

   NASD, with D'Amico's approval, sent Howard a letter announcing a final decision before hearing was over. Howard hereby motions the SEC to contact Mr. D'Amico regarding this letter. He will be glad to confirm its existence. Therefore, Howard was denied Due Process, rendering the decision of the Hearing Panel null and void.

   D'Amico refused to allow Howard to inspect the alleged final transcript for possible errors. Mr. D'Amico will confirm this.

   Howard was never notified of the date of Appeals Hearing. Therefore, Howard was denied Due Process. Howard hereby motions the SEC to request all documentation from the NASD, District 11, Boston showing correspondence with Howard.

   D'Amico filed a document revoking Howard's attorney-client privilege. Therefore, Howard was denied access to an attorney based on D'Amico's "legal" advice. Mr. D'amico also advised Howard, "as an attorney", that attorney-client privilege. is an "automatic bar under NASD regulations". Mr. D'Amico will supply the relevant documentation to the SEC clarifying his position on Attorney-Client privilege.

NASD paid Sharon Witherspoon, the hearing officer, to stay at the Hotel Meridian in Boston. D'Amico will provide the records at SEC's request. Therefore, decision is null and void due to conflict of interest on the part of Ms. Witherspoon.

NASD selectively prosecuted Howard because of his cooperation with Massachusetts State Securities officials in closing H.J. Meyers.

Carol Fiore admits, on the record forging a u-4. D'Amico used Fiore as a character witness.

2.    NASD failed to provide proof that JM is indeed deceased. One Stuart Juckett, alleged stepson of JM, stood trial for bank fraud in Virginia in 1997 and became an NASD witness in 1999. D'Amico used Juckett as a character witness. D'Amico's character witness was cited by the Boston Police Department for stalking in 1997. Howard and D'Amico will provide the actual Boston Police Report in upcoming briefs. Howard hereby motions the SEC to examine the record, page by page, to note Howard's strenuous objections. The NASD found that Stuart Juckett lied to investigators regarding forged checks. D'Amico and Witherspoon, speaking for the NASD, approved the written findings against Stuart Juckett that he lied to investigators. D'Amico and Witherspoon, and Howard, will provide documentation in upcoming briefs. D'Amico and Witherspoon have authorized, on the record, the use of a Web Site and the Internet regarding this case, including posting of all relevant documents.

Max Mahoney of the NASD closed the case in 1997.

SEC is currently investigating the above activities of D'Amico and NASD, District 11, Boston. D'Amico and Howard will agree to provide the relevant material to SEC investigators and in the briefs to follow.

Howard therefore requests an Appeal and a Stay and declares, in any event, all actions of the NASD, et al regarding this case are hereby declared null and void and have no force or effect.

Sincerely,

Dan Howard
4 Canal Park
Cambridge, MA. 02141
617-621-9774
617-747-1948 FAX

how2go@yahoo.com

DATED: DECEMBER 15, 2000
Cc: Mr. Greg Sullivan, Esq.

I hereby affirm that a true copy of this Appeal was faxed this 15th Day of December, 2000 to:

Office of the Secretary
U.S. Securities and Exchange Commission
450 Fifth Street, N.W., Stop 609
Washington, D.C. 20549
Fax 202-942-9651

James S. Wrona, Esq.
Office of the General Counsel
NASD Regulation, Inc.

NASDR 003244

1735 K Street, N.W.
Washington, D.C. 20006
Fax 202-728-8262

NASD, District 11, Boston
FAX 617 -951-2337