

U.S. Securities and Exchange Commission

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C.

SECURITIES EXCHANGE ACT OF 1934
Rel. No. 46269 / July 26, 2002

Adm. Proc. File No. 3-10397

In the Matter of the Application of

DANIEL RICHARD HOWARD

4 Canal Park #205

Cambridge, Massachusetts 02141

For Review of Disciplinary Action Taken by the

NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.

:
:
:
:
:
:
:
:
:

OPINION OF THE COMMISSION

REGISTERED SECURITIES ASSOCIATION -- REVIEW OF
DISCIPLINARY PROCEEDING

Violations of Rules of Fair Practice

Unsuitable Recommendations

Misstatement on and Failure to Amend Form U-4

Registered representative of member firm of registered securities
association made unsuitable recommendations to a customer, falsely
stated on his Form U-4 that he was not the subject of an
investigation, and failed to amend the form thereafter. Held,
association's findings of violation and the sanctions it imposed are
sustained.

APPEARANCES:

Daniel Richard Howard, pro se.

were pressured to sell these stocks and were paid extra compensation for doing so. For 7 of the 10 months at issue, speculative securities comprised 90% of Meeker's portfolio at Meyers.

The average holding period for the securities in Meeker's account was about 40 days and, on an annualized basis, the account was turned over about 8.5 times. The annualized cost-to-equity ratio was 54%, meaning that the account would have required a 54% annual appreciation to break even. By the end of the relevant period, Meeker had lost about $35,000.[5]

It is evident that Howard's recommendations to Meeker were unsuitable. There is conflicting evidence in the record as to Meeker's financial situation.[6] However, his needs and objectives were clear. Meeker was an elderly man in poor health whose primary need was additional income and who sought investments that carried minimal risk. Even if, as Howard claimed, Meeker stated that he would like to share in the large profits that could be made from the appreciation of low-priced securities, Howard's recommendations were not justified. As we have frequently pointed out, a broker's recom mendations must be consistent with his customer's best interests.[7] Here, the speculative securities recommended by Howard were clearly at odds with those interests. Indeed, Howard conceded that his recommendations may have been improper. He stated:

[In a high pressure atmosphere like the one that existed at Meyers], you tend to . . . maybe cross over the line. And you tend to maybe make recommendations that, maybe in hindsight, even though you're tempted to blame other peo ple, and you're tempted to say, well, the client agreed to it or the client authorized it, in the full context that doesn't justify it.[8]

Recommendations may also be unsuitable for a customer if they result in excessive trading activity.[9] When a broker controls trading in a customer's account, the activity in that account must be consistent with the customer's investment objectives and needs.[10] It is clear that Meeker routinely followed Howard's recommendations and that Howard exercised de facto control over Meeker's account. It is also clear that the level of trading in that account was exces sive.

While there is no definitive turnover rate or cost-to-equity ratio that establishes excessive trading, a turnover rate of 6 or a cost-to-equity ratio in excess of 20% generally indicates that excessive trading has occurred.[11] Here both the turnover rate and the cost-to-equity ratio substantially exceeded those levels. In addition, there was a pattern of "in and out" trading of the same securities in relatively short periods of time,[12] another hallmark of excessive trading.[13] Howard admitted that he "probably stepped over the line on the trading aspect" of Meeker's account.

We conclude that both the nature of the securities that Howard recommended to Meeker and the level of trading activity were unsuit able. We accordingly find that Howard violated NASD Conduct Rules 2110 and 2310.

III.

The NASD's complaint charged that, on November 2, 1998, Howard falsely checked "no" in response to Question 22I(1) on the Form U-4 that he executed in connection with his employment at NASD member firm Moors & Cabot, Inc. ("Moors"), and failed to correct his answer thereafter. Question 22I(1) asked Howard whether he had been noti fied in writing that he was the subject of an investigation that could, inter alia, lead to NASD findings of rule violations and sanctions. We have previously emphasized the importance of Form U-4. As we have stated:

Form U-4 is used by the NASD and other self-regulatory organizations, as well as by state regulators and broker-dealers, to determine the fitness of applicants for regis tration as securities professionals. The candor and forthrightness of applicants is critical to the effectiveness of this screening process.[14]

The facts with respect to Howard's alleged misstatement are as follows. On July 25, 1997, the NASD sent Howard a "Wells" letter notifying him that the NASD was considering formal disciplinary action against him for recommending unsuitable securities purchases to Meeker. In March 1998, Special NASD Notice to Members 98-27 advised that, for purposes of Question 22I on Form U-4, an investigation was defined to include "an NASD Regulation investigation after the Wells notice has been given or after an associated person has been advised by the staff that it intends to recommend formal disciplinary action."

On October 15, 1998, the NASD's Senior Regional Attorney sent Howard a letter notifying him that the attorney intended to seekauthority to institute formal disciplinary action against Howard. The letter also advised Howard that he must disclose the NASD's pending investigation (which led to the institution of this proceed ing in January 1999) to any securities firm with which he was associ ated or seeking to become associated. The letter specifically notified Howard that such disclosure must also be made in his Form U-4 when answering Question 22I.

Later that same month, Howard joined Moors as a registered representative. On November 2, 1998, Moors filed a Form U-4 on behalf of Howard, which Howard signed, that gave a negative response to Question 22I. Thereafter, Howard did not amend his Form U-4 to correct that misstatement.

Howard admitted that he received the NASD's October 15 letter. Despite the clear direction to disclose the NASD's investigation on his Form U-4, Howard stated that he left Question 22I on his Moors form blank because he was confused by the NASD's letter, having previously believed that the NASD had closed its investigation.[15] He claims that Carole Fiore, Moors' registration clerk, admitted that she "forged" a negative response to Question 22I on his form.

Fiore, who has served in her position at Moors for more than 20 years, made no such admission. She testified that, although she might have made the check mark indicating a negative reply to Ques tion 22I on Howard's form, she would have done so only after noting that the question had not been answered and obtaining the answer from Howard. She stated emphatically that she would not have answered the question on her own

initiative.

We think it clear that Howard was responsible for the false statement on his Form U-4, and that he failed to amend that misinfor mation thereafter. We accordingly sustain the NASD's findings of violation.[16]

IV.

Howard raises a myriad of procedural objections to these pro ceedings, none of which has any merit.

1. The hearing in this matter was concluded on May 27, 1999, and the Hearing Panel issued its decision on December 1. Howard argues that the Hearing Panel's decision is "null and void" because it was issued after the 60-day time limitation in Rule 9268 of the NASD's Code of Procedure. He also asserts that the delay in issuing the decision constituted laches.[17]

Rule 9268 provides in relevant part as follows:

> Within 60 days . . . , the Hearing Officer shall prepare a written decision that reflects the views of the Hearing Panel . . . as determined by majority vote.

As the NASD points out, the rule addresses the timing of the Hearing Officer's preparation of a decision (which must then be distributed to other members of the Hearing Panel), and not the issuance of the decision. In addition, for Howard to succeed on a claim of laches, he must show both a lack of diligence by the NASD and prejudice resulting from the NASD's delay.[18] No such showing has been made here.

Howard further asserts that the Hearing Officer's decision was never distributed to other members of the Hearing Panel for final approval, as evidenced by their failure to sign the decision; that the decision was not prepared within the requisite 60 days; and that, contrary to Rule 9268, the decision was not promptly served on the parties.

There is no requirement that Hearing Panel decisions be signed by all participating panel members. As the NASD points out, hearing officers normally sign all decisions on behalf of the Hearing Panel. In addition, there is no evidence that the Hearing Officer failed to prepare the decision within the requisite time, that the decision was not distributed to and approved by the other panel members, or that the decision was not promptly served on the parties after it was finalized. Nor is there any evidence that Howard was in any wayprejudiced. Even assuming that some minor procedural irregularity occurred, it would fall within the category of harmless error.[19]

2. Howard makes a number of frivolous allegations involving the NASD attorney who prosecuted the case against him. He asserts that the attorney, who is employed in the NASD's Boston office, is not licensed to practice law in Massachusetts, where the NASD hearing was held. According to Howard, this rendered the Hearing Panel's decision "null and void." He further asserts, among other things, that the attorney made a "religious and racial slur" against him on the record, refused to allow him to inspect

Jeffrey S. Holik, Susan L. Beesley, and Norman Sue, Jr., for NASD Regulation, Inc.

Appeal filed: December 15, 2000
Last brief received: May 30, 2001

I.

Daniel Richard Howard, who was a general securities representative with H.J. Meyers & Co., Inc., a former member of the National Association of Securities Dealers, Inc. ("NASD"), appeals from NASD disciplinary action. The NASD found that, during the 10-month period from October 31, 1995 through August 1996, Howard violated NASD Conduct Rules 2110 and 2310 by making unsuitable recommendations to a customer.[1] The NASD also found that, in 1998, Howard further violated Conduct Rule 2110 by filing with the NASD an inaccurate Uniform Application for Securities Industry Registration (Form U-4) and failing to amend it thereafter.

The NASD suspended Howard in all capacities for two years and fined him $17,500 for making unsuitable recommendations. It suspended him for 90 days (to run concurrently with his other suspension) and fined him $7,500 for his Form U-4 violations.[2] We base our findings on an independent review of the record.

II.

This case involves Howard's securities recommendations to his customer, John B. Meeker. At the time he opened a Meyers account with Howard at the end of October 1995, Meeker was 85 years old, retired, and in poor health. He told his wife that he opened the Meyers account because he needed more income to cover his increasing medical expenses.

Meeker died in November 1998, prior to the hearing in this proceeding.[3] His widow testified that her husband was "very conservative" and "risk averse." She stated that she heard Meeker tell Howard several times that he wanted "safe stocks." According to Mrs. Meeker, her husband consistently followed Howard's advice with respect to stock purchases and sales, and she never heard him refuse to go along with one of Howard's recommendations. Mrs. Meeker's testimony is supported by a letter that her husband wrote to Meyers in August 1996, at the end of the relevant period. The letter stated in part as follows:

As an older customer on a fixed income with failing eyesight and dexterity, I have for many years maintained a minimal risk investment strategy. When my business moved to your firm last year, I was not informed or warned that investments made by my broker were substantially higher in risk. Only the positive aspects of investment recommendations were discussed. The (unauthorized) actions of my broker have substantially reduced the value of my portfolio while producing significant commissions for your firm.

During the period at issue, Meeker made 30 purchases of 8 different speculative securities on Howard's recommendation.[4] All of the securities were so-called "house stocks" in which Meyers made a market. Salesmen

the transcript of the hearing, and "filed a document revoking his attorney-client privilege," thereby denying him access to counsel.

As Howard was informed by the Massachusetts Board of Bar Overseers, there is no requirement that NASD staff attorneys in Massachusetts be licensed to practice in that state.[20] In addition, the record contains no evidence of any racial or religious slur, and the NASD attorney denied making any such comment.[21] There is also no evidence that Howard was denied a copy of the hearing transcript, and the NASD disputes that claim. The record shows that Howard was duly notified that he could either purchase a copy of the hearing transcript from the reporting service or review the transcript at the NASD's Boston office. He apparently chose to do neither. The NASD's National Adjudicatory Council ("NAC") subsequently provided Howard with a copy of the transcript without charge.

Howard's claims that his attorney-client privilege was "revoked" and that he was thereby denied access to counsel are similarly without foundation. The claims are apparently based on the following exchange of correspondence. On March 14, 1999, the NASD attorney requested that Howard supply various documents, including all documents in his possession relating to Meeker. Howard replied on March 22, stating that the requested documents, if they existed at all, were in his attorney's files, and therefore subject to the attorney-client privilege. The NASD attorney replied on March 23, informing Howard that the mere fact that the documents were in hisattorney's possession did not shield them from discovery, and asking that Howard, in consultation with his attorney, revisit his decision not to provide the requested information. The letter threatened Howard with possible disciplinary action if he did not comply with the NASD's request.[22] We find no impropriety in the NASD's action.[23]

3. Howard contends that the NASD's decision is also "null and void" because the NASD is subject to a "conflict of interest." He asserts that the conflict arose when the NASD hired James Nestor, a former Meyers compliance officer who approved some of Howard's trades with Meeker. Howard suggests that the NASD sought to silence a potential witness on his behalf. He further claims that the Commission also is subject to a conflict of interest because Howard is cooperating in an investigation of the NASD's Boston office that this agency is supposedly conducting.

Howard's claims with respect to Nestor are wholly lacking in substance. Nestor was employed by the NASD as an examiner-trainee for a total of only four days in early 1997, nearly two years prior to the institution of this proceeding. Howard has not shown that this brief employment prejudiced him in any way, and neither he nor the NASD chose to call Nestor as a witness.[24]

The only evidence of a Commission investigation offered by Howard consists of two letters from Commission staff members acknowledging the receipt of complaints that Howard filed against the NASD's Boston office. Even assuming that our staff was conducting an investigation with Howard's cooperation, we see no reason why that circumstance should disqualify us from considering Howard's appeal on the basis of the record before us.

4. Howard further claims that the Hearing Officer was biased because the

NASD paid her hotel expenses. He also argues that he was the victim of selective prosecution.

The Hearing Officer's routine receipt of reimbursement for travel expenses hardly suffices to demonstrate bias, and our review of the record shows that the Hearing Officer conducted this proceeding in a fair and impartial manner. To succeed on a claim of selective prosecution, Howard must establish that he was singled out for enforcement action while others who were similarly situated were not, and that his prosecution was motivated by arbitrary or unjust considerations such as race, religion, or the desire to prevent the exercise of a constitutionally-protected right.[25] Howard has made no such showing.

5. Howard asserts that he was denied due process because he was never notified of the date of oral argument before the NAC. When Howard did not appear for the argument, it was canceled. In accordance with Rule 9342 of the NASD's Code of Procedure, the NAC subsequently rendered a decision on the basis of the record, without hearing argument.[26]

Rule 9341(c) of the NASD's Code provides that notice of oral argument before the NAC shall be served on the parties at least 21 days before the hearing. Rule 9134 governs methods of service.[27] That rule provides in relevant part that service may be made by first class mail, first class certified mail, or commercial courier, and that service on a natural person may be made at the person's residential address, as reflected in the Central Registration Depository ("CRD"). The rule further provides that service by mail is complete upon mailing.

On April 3, 2000, the NASD sent Howard a letter by Federal Express, first class mail, and certified mail notifying him that oral argument before the NAC had been scheduled for April 28 at a specified time and place. The letter was sent to Howard's CRD address in Cambridge, Massachusetts, Howard's residence since August 1995. Howard still uses that address, as indicated by the papers he has filed with us in this proceeding. Another copy of the NASD's letter was sent to Howard on April 4 and, on April 24, the NASD sent Howard a reminder of the scheduled argument. Both of these letters were directed to the same Cambridge address and sent by the same methods used for the initial letter. As noted above, the NASD's rule provides that service by mail is complete upon mailing. We consider that Howard was given adequate notice of the oral argument before the NAC.[28]

6. Howard asserts that his ability to defend himself and obtain counsel for this appeal was "irrevocably damaged" because a Commission official was unable to inform him where "the original files of this case" were located, and refused to grant him an extension of time to file a brief in support of his petition for review.

Immediately following his appeal to the Commission, Howard was notified that the NASD would shortly file with us a certified copy of the record in his case together with an index to that record, and that he would receive a copy of the index to assist him in preparing his brief. The certified copy of the record was available at the Commission for Howard's inspection and copying.[29] Contrary to Howard's further assertion, he was granted a month's extension to file his brief.[30]

V.

As the NASD found, Howard engaged in egregious misconduct. He betrayed the trust of an elderly customer in order to profit at the customer's expense. He also provided false information on

his Form U-4 and blamed a firm employee for his own misstatement. Under the circumstances, we are unable to conclude that the relatively lenient sanctions assessed by the NASD are excessive or oppressive.

An appropriate order will issue.[31]

By the Commission (Chairman PITT and Commissioners HUNT and GLASSMAN).

Jonathan G. Katz
Secretary

## SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C.

SECURITIES EXCHANGE ACT OF 1934
Rel. No. 46269 / July 26, 2002

Adm. Proc. File No. 3-10393

In the Matter of the Application of

DANIEL RICHARD HOWARD

4 Canal Park #205

Cambridge, Massachusetts 02141

For Review of Disciplinary Action Taken by the

NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.

ORDER SUSTAINING DISCIPLINARY ACTION TAKEN BY REGISTERED SECURITIES ASSOCIATION

On the basis of the Commission's opinion issued this day, it is

ORDERED that the disciplinary action taken by the National Association of Securities Dealers, Inc. against Daniel Richard Howard, and the Association's assessment of costs, be, and they hereby are, sustained.

By the Commission.

Jonathan G. Katz
Secretary

---

1   Rule 2110 requires the observance of "high standards of commercial honor
    and just and equitable principles of trade." Rule 2310 requires that, in
    recommending the purchase or sale of any security to a customer, a member
    must have reasonable grounds for believing that the recommendation is
    suitable for that customer based on the facts, if any, disclosed by the customer
    as to his other securities holdings and his financial situation and needs.

2   The NASD also assessed costs.

3   Howard claims that the NASD "failed to provide proof" of Meeker's demise.
    Meeker's widow testified to her husband's death. If Howard had any evidence
    to the contrary, the burden was on him to produce it. See Ronald Earl Smits,
    50 S.E.C. 1020, 1024 (1992).

4   The securities were Palomar Medical Technologies, Inc., Adaptive Solutions,
    Inc., Community Medical Transportation, Inc., Magna Lab Class A, Inc.,
    Nashville Country Club, Inc., Excel Technologies, Inc., American Materials &
    Tech Corp., and Dynagen, Inc.

5   At its height, Meeker's account had $128,606.34 in total assets.

6   The record contains three Meeker new account applications, dated from May
    1994 to October 1995, at three different brokerage firms. Meeker's reported
    annual income on those forms ranges from less than $15,000 to between
    $50,000 and $100,000. His reported net worth ranges from between $50,000
    and $100,000 to more than $700,000. Meeker's widow, who under the terms
    of a pre-nuptial agreement did not inherit anything from Meeker's estate,
    expressed the belief that Meeker had liquid assets of "less than $350,000." An
    NASD investigator testified that Meeker "possibly had net worth of less than or
    around $150,000."

7   See, e.g., John M. Reynolds, 50 S.E.C. 805, 809 (1992).

8   Howard further stated: "If I had to do it over again, . . . I would not do it,
    period. . . . I would not handle [Meeker's] account the way it was handled."

9   See Rafael Pinchas, Securities Exchange Act Release No. 41816 (Sept. 1,
    1999), 70 SEC Docket 1516, 1526-1527; David A. Gingras, 50 S.E.C. 1286,
    1289 n.4 (1992).

10  Rafael Pinchas, supra, 70 SEC Docket at 1521; John M. Reynolds, supra, 50
    S.E.C. at 806.

11  Mihara v. Dean Witter & Co., 619 F.2d 814, 821 (9th Cir. 1980); Rafael
    Pinchas, supra, 70 SEC Docket at 1524-1525; Peter C. Bucchieri, 52 S.E.C
    800, 805 (1996).

12  For example, Meeker purchased 1,000 shares of Magna Lab Class A, Inc.
    ("Magna") on March 5, 1996, and an additional 1,000 shares on March 14. He
    sold all of these shares on March 27. On June 17, he purchased 1,700 shares
    of Magna, and an additional 3,300 shares on June 27. On July 22, he sold
    2,500 shares of Magna.

13  Rafael Pinchas, supra, 70 SEC Docket at 1523.

14  Thomas R. Alton, 52 S.E.C. 380, 382 (1995), aff'd, 105 F.3d 664 (9th Cir.
    1996) (Table).

15 Howard claims that an NASD attorney told him that his case had been closed. A letter in the record from the attorney's counsel states that the attorney "is certain that he would not have represented that the case was closed, as it was not."

16 Given the important function served by the information made available through Form U-4, we consider the sanctions imposed here to be unduly lenient.

17 Howard also claims, somewhat inconsistently, that the NASD sent him a letter announcing its final decision before the hearing was completed. There is no evidence in the record that any such letter was ever sent.

18 See Larry Ira Klein, 52 S.E.C. 1030, 1038 (1996), and the cases cited in note 31 of that opinion.

19 See U.S. Associates, Inc., 51 S.E.C. 805, 812 (1993), and the cases cited in note 24 of that opinion.

20 Howard also suggests that the attorney is not licensed in any jurisdiction. The attorney denied this charge. In any event, whether or not the attorney was licensed has no bearing on the validity of these proceedings, and is irrelevant to our determination of the issues before us.

21 Howard also claims that the attorney uttered other insults and threats. However, there is no support in the record for this claim.

22 Rule 8210 of the NASD's Code of Procedure authorized the NASD to obtain the requested information.

23 The record does not indicate whether Howard subsequently complied with the NASD's request.

24 Howard attacks the credibility of Stuart Juckett, Meeker's stepson, asserting that the NASD used Juckett as a "character witness." However, like Nestor, Juckett did not testify at the NASD hearing.

25 See United States v. Huff, 959 F.2d 731, 735 (8th Cir. 1992); Barry C. Wilson, 52 S.E.C. 1070, 1074 (1996).

26 Rule 9342 provides that a party who requests oral argument but fails to appear after being duly notified is deemed to have waived any opportunity for oral argument.

27 NAC review proceedings are governed primarily by the 9300 Series of Code rules. However, Rule 9110 of the Code provides that the Rule 9100 Series is of general applicability to all Rule 9000 Series proceedings unless a rule specifically provides otherwise.

28 The NASD seeks to adduce as additional evidence a Federal Express receipt which shows that, on April 25, 2000, one L. Green signed for the notice sent to Howard to remind him of the argument. Howard opposes the admission of this document. We need not reach this issue. Its resolution is unnecessary to our determination of Howard's claim that he was denied due process.

29 See 17 C.F.R. §§ 200.80 and 200.80a.

30 Howard requests that we investigate various matters, obtain documents from the NASD, and seek confirmation from the NASD's prosecuting attorney of statements made by Howard in his briefs. We deny all of these requests.

31 We have considered all of the arguments advanced by the parties. We reject or sustain them to the extent that they are inconsistent or in accord with the views expressed herein.

*http://www.sec.gov/litigation/opinions/34-46269.htm*